## APPLIED DIGITAL DATA SYSTEMS INC., Plaintiff,

v.

## MILGO ELECTRONIC CORPORATION et al., Defendants.

No. 76 Civ. 5454.

United States District Court,
S. D. New York.

Jan. 3, 1977.

---

Dembrow, Joel E. Davidson, New York City, of counsel.

Shearman & Sterling, New York City, for defendant Racal Electronics Ltd.; W. Foster Wollen, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This is a motion by plaintiff, Applied Digital Data Systems Inc. ("ADDS") for a preliminary injunction to restrain Milgo Electronic Corporation ("Milgo") from consummating a sale of 312,000 shares of its authorized and unissued common stock to Racal Electronics Limited ("Racal") pending a trial upon the merits of plaintiff's claims that Milgo, Racal and the individual defendants (directors of Milgo) committed various violations of the Securities Exchange Act of 1934[1] in connection with ADDS' proposed exchange offer for Milgo stock, referred to hereafter. Essentially, the claims are that the alleged illegal conduct will deprive ADDS of its right to solicit the shares of Milgo through its exchange offer, and also will deprive Milgo's shareholders of the opportunity to consider that exchange offer. The hard core of ADDS' contention is that the sale, which would make Racal Milgo's single largest shareholder, has no proper corporate purpose but was designed solely to defeat ADDS' exchange offer.

On December 8, 1976, the day the sale was to have been consummated, a temporary restraining order was granted by Judge Motley, sitting as the emergency judge, following which the matter was assigned to this court. Since then extensive discovery has been conducted and all parties have had extensive documentary production.

Wachtell, Lipton, Rosen & Katz, New York City, for plaintiff; George A. Katz, Allan A. Martin, Alan D. Handler, New York City, of counsel.

Cahill Gordon & Reindel, New York City, for defendant Milgo Electronic Corp.; Raymond L. Falls, Jr., F. Arnold Daum, Ira J.

## I. BACKGROUND

ADDS, a Delaware corporation organized in 1969, is engaged principally in the production of "dumb" computer terminals, i. e., terminals which have within themselves lit-

---

1. 15 U.S.C. § 78a, et seq.

tle or no capacity to perform calculations or other operations associated with the function of a computer. These terminals are sold largely to manufacturers of computer systems for incorporation into those systems.

Milgo, a Florida corporation, was organized in 1955 and manufactures devices to convert computer signals into signals which can be transmitted telephonically, and vice versa. Milgo also manufactures computer terminals.

Racal is a United Kingdom corporation with its principal place of business in Bracknell, England, which manufactures certain electronic equipment. Milgo and Racal each own a fifty per cent interest in Racal-Milgo Limited, a United Kingdom corporation which is the exclusive distributor of certain Milgo products in foreign markets. Racal-Milgo is Milgo's largest single customer, accounting in 1975 for approximately twenty-three per cent of Milgo's total world-wide revenues.

Since early 1974, ADDS has viewed Milgo as a desirable takeover target. However, before November 1976 ADDS made no definitive proposal, principally because the time was not propitious or because ADDS did not have the necessary funds. On November 5, 1976 ADDS, in a letter addressed to Milgo's Board of Directors, proposed a merger designed as a tax free reorganization under federal income tax laws. Under the proposal each common share of Milgo would have been converted on a tax-free basis into one and one-half common shares of ADDS at a substantial premium to Milgo shareholders over the then market price of Milgo.[2] The letter requested that the proposal be submitted to Milgo's shareholders for their approval. Milgo's Board did not respond directly to ADDS' communication. Instead, on November 9, 1976, following a meeting of the Milgo Board at which the proposal was considered and unanimously

rejected, Milgo issued a press release ("first press release"), which was carried over the Dow Jones "broad tape" and otherwise disseminated to the news media. The release announced that Milgo's directors had rejected to ADDS merger proposal "because it is not in the best interest of the shareholders and does not reflect the long-term prospects of the Company."

Undeterred by the rejection of its merger proposal, ADDS, on November 15, 1976, issued a public announcement that after the appropriate steps had been taken to comply with the federal securities laws and after securing authorization from ADDS' stockholders,[3] it would make an exchange offer directly to Milgo shareholders. ADDS announced it would offer to exchange one share of a new issue of ADDS convertible preferred stock, $1 par value, for any and all shares of Milgo common stock. Each share of this preferred stock would be (a) convertible after one year into 1½ shares of ADDS common stock; (b) entitled to annual cumulative dividends of $1.00; (c) entitled to one and one-half votes; (d) entitled to a liquidation preference of $25; (e) redeemable after one year at the option of ADDS' Board of Directors at a price of $25.

The next day, November 16, Milgo issued another press release ("second press release"), which was disseminated generally to the news media and which the Wall Street Journal reported on November 17, 1976 as follows:

> Miami, Fla. Monroe A. Miller, Chairman of Milgo Electronic Corp., said the latest proposed offer by Applied Digital Data Systems Inc. to acquire Milgo isn't as good as the one that Milgo's directors rejected last week.
>
> Management's opinion, Milgo said in a short statement, is that "the revised proposal appears to be even less favorable to our shareholders than the exchange offer

---

**2.** On November 4, 1976, Milgo common stock closed on the New York Stock Exchange at $19.125. That same day ADDS common stock, which is traded over the counter, closed with bid and asked price quotations of $19.25 and $20.00, respectively.

**3.** Shareholder approval was necessary because the exchange offer required ADDS to amend its charter to increase its authorized stock.

that was turned down last week by the unanimous decision of the Milgo board."

On November 19 Milgo's Board of Directors met and discussed ADDS' exchange offer. According to the minutes of that meeting, the Board agreed that information as to the exchange offer was "insufficient to make a fully informed judgment" but that based upon available information the "current proposed offer is less favorable to shareholders than the offer of merger previously submitted by ADDS to the Company directly." Notwithstanding these events, ADDS undertook preparation of a registration statement, a Schedule 13D and proxy materials, all of which were required under the federal securities laws in connection with the proposed exchange offer, and filed them with the Securities and Exchange Commission ("SEC") on December 13, 1976.

However, subsequent to the first press release, Milgo and Racal engaged in certain actions, the results of which came to light on November 29, 1976, when Milgo made a public announcement that it had agreed to sell Racal 312,000 of its authorized but unissued shares. The events that led to this agreement, according to deposition testimony, were as follows. On November 11, two days after the Milgo Board of Directors had rejected ADDS' merger proposal, Monroe A. Miller, Milgo's President and Chairman of the Board, made an overseas telephone call to Ernest T. Harrison, the managing director of Racal, to advise him of the merger proposal and its rejection. Harrison testified that he then inquired whether Milgo was short of cash. When Miller responded that Milgo had been unable to raise equity capital, Harrison volunteered that Racal was in a strong liquid position. Thereupon they renewed proposals for Racal to purchase Milgo stock, which had been considered in 1974 and 1975 but abandoned.

On November 17, Derek Berry, Racal's corporate secretary, wrote to the Bank of England requesting approval for the purchase by Racal of enough new shares of Milgo common stock so that Racal would hold twenty per cent of the outstanding shares, at a cost of approximately £7,000,-000. Racal desired a twenty per cent equity share so that under English law Milgo would be considered Racal's associate company and Racal would be able to incorporate a portion of Milgo's profits in its financial statements, even though no portion of that profit was remitted to the United Kingdom. The letter expressed anxiety about the proposed takeover of Milgo and also noted that the "Board of Milgo Electronic Corporation are concerned that the interest created by these two offers [ADDS' merger and exchange proposals] could well generate counter offers from other competitors." Two days later, November 19, the Bank of England authorized the transaction and noted "[t]he authority is valid for twelve months from the date of this letter."

At the meeting of Milgo's Board of Directors on November 19, immediately after ADDS' exchange offer was considered, reference to which has already been made, Miller advised the Board of Racal's offer and that representatives of both companies would confer about the matter the following week. The Board then authorized the transaction and an application to the New York Stock Exchange (the "Exchange") for the listing of 382,300 new shares of common stock. On November 22, 1976, Milgo's attorneys applied to the Exchange for a listing of the 382,300 shares of common stock. The attorneys expressly requested that the Exchange confirm that under its rules the sale would not require stockholder approval.[4] The letter to the Exchange stated, among other matters, that while there was no written agreement with respect to placing designees of Racal on the Board of

---

4. The Rules of the New York Stock Exchange require stockholder approval of transfers of shares of "approximately 20%" of a company's stock as a condition of listing the securities (NYSE Manual—A–284(c)). The Exchange interprets "approximately 20%" as 18.5%. Be-

cause of the accounting effects noted above, Racal at all times was interested in acquiring 20% of Milgo's increased equity, or 450,000 shares. However, it agreed to a purchase of 382,300 shares, since this amount appeared not to require stockholder approval.

Directors of Milgo, it was "anticipated . . . that Racal [would] request that Milgo use its best efforts to cause two designees of Racal to be placed on Milgo's Board of Directors and that Milgo [would] do so."

However, even though an issue of 382,300 shares, constituting 18.4% of Milgo's contemplated outstanding shares, on its face qualified under the Exchange Rules for listing without stockholder approval, the Exchange did require such approval in this case. Thereupon Milgo and Racal reduced the amount of the sale to 312,000 shares (15.5%) and the Exchange agreed to list the shares without stockholder approval. However, the Exchange was made aware that Racal desired ultimately to purchase a twenty per cent interest in Milgo and that if Racal could not purchase the necessary additional shares in the market at reasonable cost, the shareholders of Milgo would be asked at their next annual meeting to authorize issuance of the amount required for Racal to obtain the twenty per cent.

Racal and Milgo concluded their negotiations and on November 29 Milgo issued a press release announcing that Racal had agreed to purchase 312,000 shares of Milgo common stock at $21.50 a share for a total of $6,708,000, that the proceeds of the sale would be used by Milgo to reduce its bank borrowing, and that the sale would be consummated as soon as the additional shares had been approved for listing by the Exchange. A written agreement covering the terms of the sale was executed by Milgo and Racal as of November 30, 1976; the agreement provided for closing to take place not later than March 31, 1977.

On November 30 Racal's Board of Directors met to discuss the transaction. A report prepared by Berry for the meeting stated:

> Milgo Electronic Corporation has been the subject of a takeover bid by Allied Digital Data Systems Inc. It is considered that should this bid be successful, it could be detrimental to the future pros-

pects of our jointly owned company Racal-Milgo Limited.

> The Directors of Milgo Electronic Corporation have stated that in their opinion, the acceptance of the bid is not in the best interest of their shareholders.

> Following discussions with us on methods by which the bid could be defeated, it was decided that the most effective method would be for Racal Electronics Limited to acquire a proportion of the issued share capital of Milgo Electronic Corporation.

Racal's Board approved the transaction, but in delivering its executed copy of the agreement to Milgo on December 8, Racal reserved (by a side letter) the right in its "sole discretion" not to consummate the purchase if it determined that any litigation with respect to the purchase should make it undesirable to proceed. Previously, on December 2, Racal had notified the Bank of England that "under the New York Stock Exchange Regulations, Milgo were only allowed to allot us new shares equal to 15.5% of the new total equity, whereas it is [Racal's] wish to hold not less than 20%" and requested the Bank of England's consent to the purchase of the additional amount in the market. The Bank consented the next day.

On December 3, 1976 the Milgo Board of Directors met and Miller advised the directors that the Exchange had determined that 312,000 shares could be sold to Racal without stockholder approval. The Board then ratified the agreement. Formal approval was sought from the Exchange and received on December 8, the day the sale was to be consummated.

## II. THE CLAIMS

Against the background of the foregoing facts, ADDS contends that defendants engaged in a deliberate, fraudulent and illegal plan to defraud it (ADDS), the shareholders of Milgo and the investing public.

ADDS alleges in its amended complaint (1) that Milgo and its management have violated section 14(e) of the Williams Act [5]

---

**5.** 15 U.S.C. § 78n(e).

and Rule 10b–5 [6] adopted under section 10(b) of the Securities Exchange Act of of 1934 [7] by disseminating untrue and misleading statements of material facts in connection with the proposed exchange offer; (2) that Milgo, Racal and their managements have violated section 14(e) and Rule 10b–5 by engaging in a fraudulent scheme to sell a large block of Milgo common stock to Racal for the sole purpose of defeating the proposed exchange offer; (3) that Milgo, Racal and certain of their management have violated section 13(d) of the Williams Act [8] by failing to file a Schedule 13D [9] with the SEC, having formed a group owning in excess of five per cent of the shares of Milgo common stock for the purpose of defeating the proposed exchange offer; (4) that Milgo and certain of its management have violated section 14(d) of the Williams Act [10] by failing to file a Schedule 14D before recommending that Milgo shareholders oppose or reject the ADDS offer; and

(5) that the defendants will violate section 13(e) of the Williams Act [11] if the sale of Milgo stock to Racal is effected.

## III. ALLEGED VIOLATIONS OF SECTIONS 14(d) AND (e)

Defendants Milgo and Racal contend that their actions were not proscribed by sections 14(d) and 14(e) of the Williams Act because those provisions become applicable only when an exchange offer has actually been made to shareholders, or at least filed with the SEC, and not when, as here, a corporation has publicly announced its intention to make an exchange offer in the future.[12] This argument focuses on the language of section 14(e), which prohibits misrepresentations and fraudulent schemes "in connection with any tender offer," [13] and of section 14(d), which requires specified information to be disclosed whenever a "solicitation or recommendation [is made] to the holders of . . . a security to accept or reject a tender offer." [14] In asserting that

---

**6.** 17 C.F.R. § 240.10b–5.

**7.** 15 U.S.C. § 78j(b).

**8.** 15 U.S.C. § 78m(d).

**9.** Schedule 13D is a reporting form adopted by the SEC pursuant to section 13(d) of the Williams Act, 15 U.S.C. § 78m(d). The schedule contains information about the background and identity of the person filing, the source of funds used to make purchases of stock, the amount of stock beneficially owned, the purpose of the purchases, any plans the purchaser proposes to implement if he gains control over the issuing corporation, and any contracts or understandings that he has with other persons concerning the securities of the issuing corporation. Section 13(d) requires a Schedule 13D to be filed by any person who acquires five per cent of any class of equity securities required to be registered under the Exchange Act. 15 U.S.C. § 78m(d). In addition, Section 14(d) of the Williams Act requires a Schedule 13D to be filed by any person mounting a tender offer that, if successful, would result in the acquisition of five per cent of any class of an equity security required to be registered under the Exchange Act. 15 U.S.C. § 78n(d)(1).

**10.** 15 U.S.C. § 78n(d).

**11.** 15 U.S.C. § 78m(e).

**12.** Although §§ 14(d) and 14(e) are phrased in terms of "tender offers," generally taken to

mean offers to purchase a target company's shares for cash, there is no doubt that the provisions of the Williams Act are equally applicable to "exchange offers," in which the offeror seeks to exchange securities for the stock of the target company. *See Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 358 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); S.Rep. No. 550, 90th Cong., 1st Sess. (1967), *quoted in* 2 U.S. Code Cong. & Admin.News 2811, 2821 (1968).

**13.** Section 14(e), 15 U.S.C. § 78n(e), provides in full:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

**14.** Section 14(d), 15 U.S.C. § 78n(d), insofar as it is here relevant provides:

(4) Any solicitation or recommendation to the holders of . . . a security to accept

these provisions are triggered only by extant tender or exchange offers, the corporate defendants both attack ADDS' standing to bring the present action and assert its failure to state a claim upon which relief can be granted.

It is too late in the day, however, to argue that an offeror—or for that matter, a target corporation—does not have standing in the constitutional sense [15] to assert violations of section 14 by its adversary in the contest for corporate control. The primary purpose of Congress in adopting the Williams Act was to ensure that the public shareholder confronted with a tender or exchange offer would be provided with complete and truthful information about the offeror, the terms and probable consequences of the offer and the interests and qualifications of any person recommending

acceptance or rejection of an offer.[16] It is clear that an offeror has standing to seek relief for acts of a target company's management that violate section 14 and threaten direct economic injury to the offeror.[17]

■ In practical terms, the situation is no different when the offer has been announced but not formally made. Thus, when ADDS made a public announcement of its forthcoming offer, it had a legally cognizable interest in Milgo and in the actions taken by the Milgo Board of Directors in response to the announcement.[18] Allowing it to maintain this suit not only provides a remedy to the wronged offeror, but also serves to effectuate the broader purposes of the Williams Act by putting the tools for enforcement of its fair-play provisions into the hands of those most likely and able to make use of them.[19]

or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Pursuant to this provision, the SEC has adopted Rule 14d–4, 17 C.F.R. § 240.14d–4, which provides that:

No solicitation or recommendation to the holders of a security to accept or reject a tender offer . . . shall be made unless, at the time copies of the solicitation or recommendation are first published or sent or given to holders of the security, the person making such solicitation or recommendation has filed with the Commission a statement containing the information specified by Schedule 14D . . . .

Schedule 14D requires the person filing to specify the reasons for his recommendation to security holders, to disclose certain information concerning his identity, background and interest in the tender offer, and to divulge arrangements by which others have been employed on his behalf to make recommendations with respect to the offer. *See* SEC Exchange Act Release No. 34–8370 (July 30, 1968), *as amended by* SEC Exchange Act Release No. 34–8392 (Aug. 30, 1968).

**15.** "The hallmark of a case or controversy is the presence of adverse interests between parties who have a substantial personal stake in the outcome of the litigation." *Evans v. Lynn,* 537 F.2d 571, 591 (2d Cir. 1976) (en banc).

**16.** *See* H.R.Rep. No. 1711, 90th Cong., 2d Sess. 2–3 (1968), *quoted in* 2 U.S.Code Cong. & Admin.News 2812–14 (1968).

**17.** *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 358–61 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). *See Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 871 (2d Cir. 1974), *cert. denied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974); *Gulf & Western Indus., Inc. v. Great Atlantic & Pacific Tea Co.,* 476 F.2d 687, 695–96 (2d Cir. 1973); *GAF Corp. v. Milstein,* 453 F.2d 709, 719–20 (2d Cir. 1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972) (target corporation has standing to assert violations of sections 14(d) & (e) and 13(d)); *Butler Aviation Int'l, Inc. v. Comprehensive Designers, Inc.,* 425 F.2d 842, 843 n.1 (2d Cir. 1970) (target corporation has standing under section 14(e)); *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 944–46 (2d Cir. 1969) (same); *Crane Co. v. Anaconda Co.,* 411 F.Supp. 1208 (S.D.N.Y.1975) (offeror has standing under section 14(e)); *Jewelcor, Inc. v. Pearlman,* 397 F.Supp. 221 (S.D.N.Y.1975) (offeror has standing under sections 14(e) and 13(d)) (*semble*).

**18.** *See Crane Co. v. Anaconda Co.,* 411 F.Supp. 1208, 1209 (S.D.N.Y.1975).

**19.** *See Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 361 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); *GAF Corp. v. Milstein,* 453 F.2d 709, 719, 721 (2d Cir. 1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972); *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 940, 945 (2d Cir. 1969).

The contention that the requirements of section 14(d) and (e) are not applicable until an exchange offer has actually been promulgated is thus better viewed as bearing upon whether ADDS states a claim for relief under those sections.[20] At the outset, it must be noted that this argument, insofar as it rests on statutory language, is not logically sound. There is no apparent reason why any given action may not be taken "in connection with" a development reasonably certain to take place in the future or why a recommendation to reject a proposed tender offer is not also a recommendation to "reject a tender offer." Indeed, Rule 10b–5, which was adopted by the SEC under section 10(b) of the Securities Exchange Act and after which section 14(e) was closely patterned,[21] requires that a complained of action take place "in connection with the purchase or sale of a security," yet it repeatedly has been held to create a cause of action to enjoin purchases or sales of securities that have been proposed but not yet effected.[22] Moreover, to the extent the defendants claim that no pre-offer communications or actions can ever be taken "in

connection with" a tender offer, the force of their argument is greatly impaired by a line of cases holding that to be actionable under Rule 10b–5 the fraud must have occurred prior to or contemporaneous with the sale of securities.[23]

■ A proper evaluation of whether a claim is stated under a provision of the securities laws cannot, however, be based solely upon the bare language of the statute at issue, but must take into consideration both the meaning of that language within the particular context in which it occurs[24] and the propensity of a given construction of the provision to effectuate the remedial purposes of the securities acts.[25] In this regard, the Senate Report on the Williams Act reveals the primary reasons for its enactment:

> The competence and integrity of a company's management, and of the persons who seek management positions, are of vital importance to stockholders. Secrecy in this area is inconsistent with the expectations of the people who invest in the securities of publicly held corporations

**20.** It could, of course, be argued that the particular language of sections 14(d) and 14(e) evidences a congressional intent to limit standing to sue in the pre-offer period, *i.e.*, that a prospective offeror is not within "the zone of interests to be protected or regulated by the statute . . . in question." *Association of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). This argument is attenuated at best, but assuming its validity, the issue of standing would merge into that of the existence of a right of action and might as well be analyzed under the latter rubric. *See Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 359 n.11 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973).

**21.** It has been noted that § 14(e) in effect applies Rule 10b–5 to a tender offeror and parties opposing a tender offer. *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 940–41 (2d Cir. 1969). Indeed, the language of the two provisions is identical in all operative respects except that Rule 10b–5 is applicable "in connection with the purchase or sale of any security" while § 14(e) is applicable "in connection with any tender offer."

**22.** *See, e.g., Mutual Shares Corp. v. Genesco, Inc.*, 384 F.2d 540, 546–47 (2d Cir. 1967); *Ruck-*

*le v. Roto American Corp.*, 339 F.2d 24, 26–28 (2d Cir. 1964).

**23.** *E.g., Kogan v. National Bank of North America*, 402 F.Supp. 359, 361 (E.D.N.Y.1975); *Pepsico, Inc. v. W. R. Grace & Co.*, 307 F.Supp. 713, 720 (S.D.N.Y.1960). *See also Fuller v. F. I. duPont, Glore, Forgan & Co.*, 54 F.R.D. 557 (W.D.Mo.1971).

**24.** *See SEC v. National Securities, Inc.*, 393 U.S. 453, 466, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969); *International Controls Corp. v. Vesco*, 490 F.2d 1334, 1345 (2d Cir.), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974).

**25.** *See J. I. Case Co. v. Borak*, 377 U.S. 426, 432–33, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); *Corenco Corp. v. Schiavone & Sons, Inc.*, 488 F.2d 207, 216 (2d Cir. 1973); *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 361 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); *GAF Corp. v. Milstein*, 453 F.2d 709, 719–20 (2d Cir. 1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972); *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 945–46 (2d Cir. 1969).

and impairs public confidence in securities as a medium of investment.

. . . . .

The bill avoids tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid. It is designed to require full and fair disclosure for the benefit of investors while at the same time providing the offeror and management equal opportunity to fairly present their case.[26]

With respect to section 14(e) the report states:

[This section] would prohibit any misstatement or omission of a material fact, or any fraudulent or manipulative acts or practices, in connection with any tender offer, whether for cash, securities or other consideration, or in connection with any solicitation of security holders in opposition to or in favor of any tender offer. This provision would affirm the fact that persons engaged in making or opposing tender offers or otherwise seeking to influence the decision of investors or the outcome of the tender offer are under an obligation to make full disclosure of material information to those with whom they deal.[27]

Defendants' overly strict and literal reading of the statute, which would confine the disclosure and fair-play provisions of the Act to the period after an offer has been formally made, would obviously frustrate the express remedial purposes of the statute.[28] Indeed, it would be anomalous were sections 14(d) and 14(e) not applicable to the offeror or target corporation once a public announcement of an imminent tender or exchange offer was made, for numerous misstatements, omissions and half-truths could be promulgated with relative impunity until the offer was actually filed with and approved by the SEC. Although the shareholders might not in the pre-offer period be faced with a present decision whether to exchange their stock in the target corporation, statements and actions of the target corporation and the offeror during this period clearly have the capacity to affect any future decision and should thus fall within the purview of the statute. This is especially so when, as here, the competing parties by their acts and conduct clearly indicate that in fact they deem the proposal of an exchange offer to be genuine. Thus, on December 13, shortly after its announcement, ADDS filed with the SEC its Schedule 13D and a lengthy registration statement on Form S-1 covering the preferred stock to be issued in exchange for Milgo common shares. Moreover, Milgo's press release of November 17 reveals that the Milgo Board of Directors anticipated that the proposed offer would indeed be forthcoming. The fact that ADDS had already approached the Milgo Board with a merger offer further indicates that the exchange offer was imminent and that whatever its merits the proposal was made in good faith.

Finally, although the question whether pre-offer actions may become subject to sections 14(d) and 14(e) by virtue of a public announcement of the offer has not yet been squarely presented to the courts, those cases that do bear on the issues support the conclusion that the statute is applicable. In *ICM Realty v. Cabot, Cabot & Forbes Land Trust*,[29] the court found that a complaint stated a cause of action against an offeror under section 14(e) when no tender offer had yet been made, but the defendant had "an overall plan to make a tender offer"[30] and had filed a Schedule 13D (but not a

---

**26.** S.Rep. No. 550, 90th Cong., 1st Sess. 2–3 (1967), *quoted in* 2 U.S.Code Cong. & Admin. News 2811, 2812–13 (1968).

**27.** *Id., quoted at* 2 U.S.Code Cong. & Admin. News 2821 (1968).

**28.** *Cf. Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945): "[I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish."

**29.** CCH Fed.Sec.L.Rep. [1974–75 Binder] ¶ 94,-585, at 96,046 (S.D.N.Y.1974).

**30.** *Id.* at 96,047.

registration statement) that indicated a tender offer might be forthcoming in the future. The court expressly concluded that misstatements made to prospective sellers under such circumstances fulfilled the "in connection with" requirement of section 14(e).[31] For purposes of determining whether a claim has been stated, there is little difference between the fact that the defendant in *ICM Realty* indicated in a Schedule 13D that a tender offer was anticipated while the plaintiff in the instant case made a public announcement of a forthcoming offer and shortly thereafter filed a Schedule 13D. Moreover, *ICM Realty* must be taken to support the proposition that no actual offer need be in existence for a cause of action under section 14(e) to arise.

*Anaconda Co. v. Crane Co.*[32] also recognizes that a right of action can arise under the Williams Act when statements concerning a publicly announced proposed tender offer are made before the offer is actually filed with the SEC. In that case, Crane, on August 7, 1975, announced its intent to file, at some future date, an exchange offer for approximately twenty-two per cent of the stock of the Anaconda Company. On August 8, 1975, Anaconda issued a press release warning shareholders that "it should not be assumed that the Anaconda management is sympathetic to the proposed offer." Although Crane did not file its registration statement until August 19, 1975, the court found sections 14(e) and 14(d) to be applicable to the claims that Anaconda's August 8 release was misleading and should not have

been issued prior to filing a Schedule 13D. The court found, however, that Anaconda's actions did not violate either section 14(d) or 14(e).

The cases cited by defendants to support their position cannot be read to indicate that sections 14(d) and 14(e) are not applicable once a public announcement of an imminent exchange offer has been made. Nearly all of these cases deal with the question whether purchases of a potential target company's stock prior to the filing of a Schedule 13D and prior to *any* announcement of a tender offer should themselves be characterized as part of the offer.[33] Under such circumstances, the target company itself is not likely to be aware of the possibility of an offer, and the purchaser will not have indicated that one is contemplated since he will not have reached the five per cent holding of securities that triggers the requirement of filing a Schedule 13D.[34] At that early stage, there is no contest for control with the attendant dangers of misrepresentations, nor has the purchaser acquired a large enough block of stock to warrant shareholder concern over possible shifts in corporate management. Thus, the purposes of the Williams Act would not be materially furthered by applying it to the offeror or the target company. When, however, a public announcement of a proposed offer has been made, the very dangers that the Act was intended to guard against come into play, and the application of sections 14(d) and 14(e) is thus appropriate.[35]

---

31.  *Id.* at 96,048.

32.  411 F.Supp. 1208 (S.D.N.Y.1975).

33.  *See, e.g., Copperweld Corp. v. Imetal,* 403 F.Supp. 579, 598 (W.D.Pa.1975); *D-Z Investment Co. v. Holloway,* CCH Fed.Sec.L.Rep. [1974–75 Binder] ¶ 94,771 (S.D.N.Y.1975); *Water & Wall Associates, Inc. v. American Consumer Indus., Inc.,* CCH Fed.Sec.L.Rep. [1973 Binder] ¶ 93,943, at 93,752, 93,759 (D.N.J. 1973); *Gulf & Western Indus., Inc. v. Great Atlantic & Pacific Tea Co.,* 356 F.Supp. 1066, 1074 (S.D.N.Y.), *aff'd,* 476 F.2d 687 (2d Cir. 1973).

34.  *See* note 9 *supra.*

35.  *Corenco Corp. v. Schiavone & Sons, Inc.,* 488 F.2d 207 (2d Cir. 1973), cited by the defendants, is not to the contrary. The court in that case held that an announcement of an already-effective tender offer did not itself constitute a "tender offer" within the meaning of section 14(d) requiring the defendant to include all the terms of the offer in the announcement. *Id.* at 216. Because the announcement clearly stated that it did not constitute an offer and that shareholders could only tender their shares by obtaining a copy of the formal Offer to Purchase, the court found that no purpose of the Williams Act would be served by requiring the defendant to reproduce the entire Offer to Purchase along with the announcement. *Corenco*

Since ADDS has standing to seek relief for alleged violations under sections 14(d) and (e) and meets the "in connection with" requirements of those sections, we address the issue of whether it has made a sufficient factual showing at this early stage of the litigation to entitle it to preliminary injunctive relief against activities of the defendants that allegedly unlawfully interfere with its exchange offer.

■ The rule· is well settled in this Circuit that a preliminary injunction:

> should issue only upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief.[36]

Significantly, the second prong of this test does not relieve the party seeking relief of the burden of establishing possible irreparable injury. On the contrary, having shown a possibility of such injury, that party need not demonstrate a clear likelihood of success if the balance of hardships is in his favor and if his claim presents serious questions worthy of consideration at trial.[37]

Plaintiff charges that with respect to its proposed exchange offer the defendants violated section 14(e) of the Williams Act by making false material statements of fact, omitting to state material facts, and engaging in fraudulent or manipulative acts or practices with respect to the stock sale. ADDS' prime attack, as already noted, is directed against the sale of 312,000 shares to Racal, which ADDS claims is intended solely to place a large block of Milgo common stock in management hands, thereby interfering with, if not defeating, ADDS' opportunity to succeed in the exchange offer.

The first issue to be addressed in determining if ADDS has demonstrated a likelihood of success or substantial questions going to the merits on its claims concerning misrepresentations and the proposed sale of Milgo common stock to Racal is whether those claims are cognizable under section 14(e). The Court of Appeals for this Circuit has held that section 14(e) gives rise to a cause of action in a tender offer when a target corporation "through unlawful and deceptive practices . . . [denies the offeror] a fair opportunity to succeed in its tender offers."[38] In so holding, the court incorporated into section 14(e) the common law tort principle that "interference with a 'prospective advantage', such as the opportunity to purchase property, gives rise to a cause of action in the person injured where the means of interference adopted alone is unlawful, even though the purpose itself may be justifiable."[39]

With respect to ADDS' allegations of misstatements and nondisclosures in connection with its proposed exchange offer,

---

thus did not deal with the issue whether an announcement prior to the making of a tender offer and actions taken in response to such an announcement were covered by the Act. The mere fact that an announcement of an offer has been held not to constitute an offer in no way implies that the announcement, and actions responding to it, are not taken "in connection with" a tender offer.

**36.** *Sonesta Int'l Hotels Corp. v. Wellington Assoc.,* 483 F.2d 247, 250 (2d Cir. 1973). *See also Gulf & Western Indus., Inc. v. Great Atlantic & Pacific Tea Co.,* 476 F.2d 687, 692–93 (2d Cir. 1973); *Checker Motors Corp. v. Chrysler Corp.,* 405 F.2d 319, 323 (2d Cir.), *cert. denied,* 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969); *Dino DeLaurentiis Cinematografica, S.p.A. v. D–150, Inc.,* 366 F.2d 373, 375 (2d Cir. 1966); *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir. 1953); *Sum of*

*Squares, Inc. v. Market Research Corp.,* 401 F.Supp. 53, 58–59 (S.D.N.Y.1975).

**37.** *Triebwasser & Katz v. American Telephone & Telegraph Co.,* 535 F.2d 1356, 1359 (2d Cir. 1976); *see Copperweld Corp. v. Imetal,* 403 F.Supp. 579, 607 (W.D.Pa.1975). *See also Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 65, 95 S.Ct. 2069, 2079, 45 L.Ed.2d 12 (1975) (that plaintiff sued under the Williams Act "provides no basis for concluding that it is relieved of showing irreparable harm").

**38.** *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 360 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973).

**39.** *Id.*

the elements of a violation of section 14(e) are identical to those established under Rule 10b–5.[40] Thus, section 14(e) is violated when a material misstatement or omission occurs in a communication concerning a tender offer and when the party responsible for that communication has acted with the requisite degree of scienter.[41]

Although the elements of a violation of section 14(e) based on an alleged fraudulent practice or manipulative device are not as well developed as those applicable to misstatements and omissions, recent cases in this Circuit and elsewhere give direction to the standard applicable to Milgo's proposed sale of stock to Racal. As already noted, section 14(e) was intended to make Rule 10b–5 applicable to the tender or exchange offer situation.[42] The Court is therefore warranted in turning to cases under Rule 10b–5 for guidance in deciding whether the proposed sale of Milgo stock could constitute a violation of that portion of section 14(e) which makes it unlawful for any person "to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer."

In *Marshel v. AFW Fabric Corp.*[43] and *Green v. Santa Fe Industries, Inc.*,[44] the Court of Appeals recently considered whether Rule 10b–5 is violated when majority shareholders, pursuant to state short-form merger statutes, seek to squeeze minority shareholders out of a corporation by forcing them either to sell their shares back to the corporation or to pursue their statutory right of appraisal. Expressly stating that "in these days when there are takeovers and tender offers galore . . . it is especially important to give Rule 10b–5 its full scope,"[45] the court held that a claim is stated under the rule when it is alleged that majority shareholders have breached their "fiduciary duty to deal fairly with minority shareholders by effecting the [short-form] merger without any justifiable business purpose,"[46] but rather with "the sole purpose of feeding the pocketbooks of the controlling shareholders."[47]

With due regard for the fact that the securities acts must be interpreted so as to effect their purposes, the Court is of the opinion the plaintiff states a claim under section 14(e) with respect to the sale of the Milgo stock to Racal and that the standard adopted by this Circuit in *Green* and *Marshel* is appropriately applied to that claim. In the present case, as in *Green* and *Mar-*

---

**40.** *Id.* at 362; *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 940–41 (2d Cir. 1969).

**41.** *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 362–63 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). A misstatement or omitted fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976); *see Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1301–02 (2d Cir. 1973); *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir.), *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). The Supreme Court has recently held that in a private action for damages under Rule 10b–5 the plaintiff must establish that the defendant acted with an intention "to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & 193–94 n.12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). This scienter requirement, which is satisfied by a showing of "knowing or intentional misconduct," 425 U.S. at 197, 96 S.Ct. 1375; *see Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 180–181 (2d Cir. 1976), would presumably be applicable to private actions for damages under section 14(e) of the Williams Act. In *Hochfelder*, the Supreme Court expressly declined to decide whether scienter is required to be shown in an action for injunctive relief under the securities laws, and the evidence presented in connection with the instant motion makes it unnecessary for this Court to reach that question at this time.

**42.** *See* cases cited in notes 19 and 21 *supra*.

**43.** 533 F.2d 1277 (2d Cir.), *vacated and remanded for consideration of mootness*, —— U.S. ——, 97 S.Ct. 228, 50 L.Ed.2d 162 (1976).

**44.** 533 F.2d 1283 (2d Cir.), *cert. granted*, —— U.S. ——, 97 S.Ct. 54, 50 L.Ed.2d 74 (1976).

**45.** *Id.* at 1287.

**46.** *Id.* at 1291.

**47.** *Id.* at 1290; *see also* 533 F.2d at 1281–82.

**1158**

*shel*, the Milgo defendants owe a fiduciary duty to the shareholders of their corporation, and they are alleged to have acted, without any valid corporate purpose, to deprive those shareholders of opportunities accruing to them by virtue of their stock ownership. Moreover, in the particular context of exchange offers under the Williams Act, the offeror has an independent interest in being able to present its offer to the shareholders of the target corporation without unlawful interference by the management of the target corporation.[48] ADDS may thus attack under section 14(e) a fraudulent scheme to defeat its proposed offer. As indicated by *Marshel* and *Green*, and as has been held by courts within and without this Circuit when presented with similar claims under section 14(e),[49] ADDS' burden of proof on this motion is to demonstrate, to the degree necessary to justify preliminary relief, that the defendants had no valid business purpose in attempting to effect the sale of Milgo stock to Racal and that their sole purpose was in fact to defeat the proposed exchange offer and prevent the Milgo shareholders from exercising their rights under it.

ADDS urges that the sale of stock to Racal makes the exchange offer less attractive to Milgo shareholders since Racal's 15.5% of the outstanding shares, when added to the 6.5% held by Milgo's management, would all but preclude the possibility of structuring the exchange offer on a tax-free basis as proposed and contemplated.[50] ADDS argues that this would effectively foreclose fair consideration of the offer by Milgo shareholders. Finally, ADDS contends that unless enjoined, the sale of the shares to Racal would enable Milgo's present management to enhance their voting power and permit them further to impede the exchange offer by amending the Milgo by-laws to increase the percentage of shares required to effect a merger, to stagger the terms of directors so that effective working control of Milgo will be made more difficult[51] and to entrench the positions of the present management.

Defendants resist the plaintiff's charges and contend that the purchase was motivated solely by valid business considerations—in the case of Milgo, to provide working capital for use in its business, as stated in the listing application to the Exchange; in the case of Racal, to make a sound and profitable investment of a portion of its accumulated cash. They deny that the purpose of the sale was to defeat ADDS' exchange offer, alleging it was the culmination of Milgo's lengthy search for equity funds. They contend that the statements in the first press release rejecting the merger proposal as "not in the best interest of the shareholders" and in the second press release that the exchange offer was "even less favorable" than the merger proposal

---

**48.** *See* text accompanying notes 18, 38 and 39 *supra*.

**49.** *See, e.g., Klaus v. Hi-Shear Corp.*, 528 F.2d 225 (9th Cir. 1975); *Royal Indus., Inc. v. Monogram Indus., Inc.*, Dkt. Nos. 76 Civ. 3348-R & 76 Civ. 3356-R (C.D.Cal. Nov. 29, 1976); *Crane Co. v. Anaconda Co.*, 411 F.Supp. 1208, 1210 (S.D.N.Y.1975).

**50.** The registration statement covering the preferred shares of ADDS to be exchanged for Milgo common stock filed by ADDS on December 13, 1976 contains a section setting forth the tax consequences of the exchange based on counsel's opinion, as follows:

    1. If 80% or more of the outstanding Milgo Shares are exchanged pursuant to the Exchange Offer, then for Federal income tax purposes the transaction will be treated as a "reorganization" and (a) no gain or loss will be recognized by the holders of Milgo Shares

upon exchange of their Milgo Shares for shares of ADDS Preferred Stock; . . . .

    2. If less than 80% of the outstanding Milgo Shares are exchanged pursuant to the Exchange Offer, the exchange will be a taxable disposition of the Milgo Shares by the holders thereof unless a reorganization is thereafter effected between ADDS (or a wholly-owned subsidiary of ADDS) and Milgo, and such reorganization has the effect of making the tax consequences of the exchange pursuant to the Exchange Offer identical to those outlined above with respect to the exchange of more than 80% of the Milgo Shares pursuant to the Exchange Offer.

*See* Int.Rev.Code of 1954, § 368(a)(1).

**51.** *See Spielman v. General Host Corp.*, 402 F.Supp. 190 (S.D.N.Y.1975), *aff'd*, 538 F.2d 39 (2d Cir. 1976).

were made only after due consideration of each proposal and reflected a considered judgment.

ADDS counters that the innocent cast placed upon the transaction by defendants is negated by circumstances and events surrounding it. To support its charge, ADDS points, among other items, to the report of Derek Berry presented to Racal's Board of Directors at the November 30 meeting at which Racal authorized the purchase of the Milgo shares. This report has been quoted at length above and in part stated:

> Following discussions with us on methods by which [ADDS'] bid could be defeated, it was decided that the most effective method would be for Racal Electronics Limited to acquire a proportion of the issued share capital of Milgo Electronic Corporation.

While it is true that Racal's officials upon their depositions testified they criticized Berry for the foregoing part of the report, the fact is that the report is contained in Racal's official records and was prepared by Berry following his return from the United States where he and another representative of Racal had negotiated the purchase agreement with Milgo officials.

ADDS also stresses the fact that at all times Racal desired to purchase twenty per cent of the Milgo stock, the minimum required under English law to permit it to report the earnings from Milgo as an associated company. Indeed, that still remains Racal's goal. Yet the transaction was structured to avoid the necessity of stockholder approval required under Exchange listing rules for a twenty per cent purchase. Originally Racal contemplated the purchase of 450,000 shares. When it was evident that the Exchange would not list these share without stockholder approval, the number was scaled down to 382,300, presumably because it was believed that this would satisfy Exchange requirements.[52] When it developed that the Exchange still required stockholder approval, the transaction was further reduced to 312,000 shares. There can be no question that the purpose

of the reductions was to eliminate the need for stockholder approval.

ADDS further emphasizes that prior to the merger offer, Milgo's efforts to secure equity financing, whether by public or private means, had been dormant for a substantial period. The record as thus far developed shows there had been no real activity toward this purpose since January 1976. Suddenly, following the merger offer, the sale of stock to Racal was negotiated and consummated in short order. The first step to revive the effort to obtain new capital came within forty-eight hours of Milgo's rejection of the ADDS merger proposal. Although this may be entirely free of any sinister purpose, ADDS urges that it is an integral part of the manipulative scheme engaged in by the defendants to defeat the exchange offer. To buttress this claim ADDS stresses that defendants have made inconsistent statements as to the purpose of the stock transaction proceeds. The Exchange listing application states that the proceeds would be used for working capital. At other times one or more defendants said that it was to be used to reduce outstanding bank loans or that the sale was required to meet the debt-equity requirements under various bank loan agreements.

Apart from stressing these contradictory positions, ADDS challenges that any equity capital was in fact required by Milgo. In this instance, it points to Milgo's proxy statement of January 6, 1976, which represented that "[t]here are no present plans, negotiations or agreements to issue any additional shares." The defendants respond that the statement was true when made. However, whatever the fact, ADDS relies upon this, as well as evidence purporting to show that Milgo was in compliance with the loan agreement and all other attendant facts and circumstances, as negating defendants' position that the stock purchase was solely for a valid corporate purpose.

Plaintiff also contends that Milgo has violated section 14(e) by making misstatements of material facts and failing to state

---

52. *See* note 4 *supra.*

material facts in the press releases it issued concerning the rejection of the merger proposal, the proposed exchange offer and the proposed sale of stock to Racal. The first press release, announcing that Milgo had rejected ADDS' original merger proposal, was issued prior to the time ADDS made public its intention to make an exchange offer. The statements in this release were thus not made "in connection with" an exchange offer and plaintiff is precluded from asserting that they violated section 14(e).

ADDS also charges that the statement in the second press release that the proposed exchange was even less desirable than the merger offer is false and misleading. It points out that the sale of the Milgo shares to Racal was at market price, $21.50 per share, which would appear to be less than the value of the merger proposal which Milgo's Board rejected. It may well be, as defendants contend, that other factors justify the statement, since ADDS' policy, in comparison to Milgo's, did not emphasize or allow substantial funds for research and development, which was an important ingredient in Milgo's growth and success.

Milgo's third press release, which concerned its agreement to sell shares of its common stock to Racal, did not refer to ADDS' proposed exchange offer. As has been noted, however, ADDS has produced evidence to support its claim that the sole purpose of this stock sale was to defeat the ADDS exchange offer. If the proposed transaction with Racal did bear this relationship to the exchange offer, public statements concerning that transaction would

have been made "in connection with" the exchange offer and would thus be actionable under section 14(e). ADDS contends that there was concealment of a material fact by the failure to disclose that with respect to the sale of the stock a "side" agreement had been entered into under which Racal had the right to opt out of the transaction in the event of a threatened lawsuit. Securities laws violations are also alleged in the failure to disclose an understanding between Milgo and Racal to effect the election to Milgo's Board of Directors of two Racal designees. These indeed were material matters.[53]

In addition to its claims of violations of section 14(e), ADDS asserts that Milgo has violated section 14(d) by issuing its second press release without first filing a Schedule 14D. Section 14(d)(4) and Rule 14d–4 adopted thereunder provide that no "solicitation or recommendation to holders of such a security to accept or reject a tender offer"[54] shall be made unless the person making the solicitation or recommendation first files with the SEC a statement containing the information specified by Schedule 14D.[55] Since the second press release characterized the exchange offer as "even less favorable to [Milgo] shareholders than the . . . [merger] offer turned down last week," it may well have constituted a recommendation to Milgo shareholders to reject the ADDS offer. If so, Milgo should have filed a statement pursuant to Rule 14d–4 before issuing the press release, and its failure to do so would have constituted a violation of section 14(d).[56]

---

**53.** *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 365 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973).

**54.** 17 C.F.R. § 240.14d–4. The language of section 14(d)(4) is slightly but insignificantly different. *See* text accompanying note 14 *supra.*

**55.** *See* note 14 *supra.*

**56.** The conclusion that the provisions of § 14(d)(4) may become applicable to a target corporation when an offeror makes a public announcement of an imminent exchange offer would suggest that the offeror itself should, prior to making its announcement, file a Sched-

ule 13D or at least limit the information contained in any pre-offer press release, *cf.* Rule 14d–2(f), 17 C.F.R. § 240.14d–2(f) (exempting the issuer from filing a Schedule 14D if its communication to shareholders does no more than (1) identify the tender offer referred to, (2) state that the issuer's management is studying the matter, and (3) request that shareholders defer making a determination whether to tender their shares until they have received management's recommendation). Because ADDS filed both its Schedule 13D and its registration statement containing the exchange offer shortly after commencing this action, we need not determine its pre-offer obligations under section 14(d)(1) at this time.

## IV. ALLEGED VIOLATIONS OF SECTIONS 10(b), 13(d) AND 13(e)

ADDS also alleges that the defendants have violated section 10(b) of the Exchange Act and Rule 10b–5 adopted thereunder, and sections 13(d) and 13(e) of the Williams Act. The claims asserted by plaintiff under Rule 10b–5 are identical to those advanced under section 14(e), and having found that ADDS has standing under the latter provision, the Court need not decide whether ADDS, which is neither a purchaser, seller or owner of Milgo common stock, has standing to sue under section 10(b) and Rule 10b–5.[57]

Nor is it necessary to address the claims that Milgo, Racal and certain members of their boards of directors have violated section 13(d) by forming a shareholder group for the purpose of defeating the proposed exchange offer and by failing to file a Schedule 13D. Plaintiff has not made the requisite showing that members of Racal's Board have agreed with Milgo or any of its directors to hold their Milgo stock for this purpose,[58] and because Milgo and its management are subject to section 14(d), the provisions of section 13(d) are inapplicable to them.[59]

Finally, no purpose would be served by analyzing the claim that Milgo and Racal are likely to violate section 13(e) if the sale of stock to Racal is consummated. This claim, which is on its face legally dubious, was not briefed or argued by the parties, nor was evidence in support of it submitted to the Court.

## V. AVAILABILITY OF PRELIMINARY RELIEF

In presenting ADDS' various claims and the matters relied upon to sustain them, the Court, of course, does not pass upon the ultimate merits. The contentions of the respective parties and the resolution of controverted issues remain for further exploration upon a trial. The various matters relied upon to support ADDS' charge of unlawful conduct must be considered against the totality of all evidence upon a trial, where the demeanor of live witnesses may be of special significance since the motives which inspired certain actions are central to this case. The array of facts advanced by ADDS, supported by deposition testimony and documentary proof, and evaluated against defendants' counter-contentions, constitutes substantial evidence in support of ADDS' claims, even though the final decision must await trial. In sum, plaintiff has made an adequate showing of sufficiently serious questions going to the merits, at least with respect to its sections 14(d) and 14(e) claims, to make them a fair ground for litigation.

---

57. See *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 359 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). Although we do not reach the issue of standing under Rule 10b–5, it is noted that considerable authority exists in this Circuit and elsewhere to the effect that section 14(e) was intended by Congress to supplant Rule 10b–5 insofar as the latter provision could be invoked in injunctive actions by tender offerors that had neither purchased nor sold securities of the target corporation. *See id.; GAF Corp. v. Milstein,* 453 F.2d 709, 721–22 (2d Cir.), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972); *Iroquois Indus., Inc. v. Syracuse China Corp.,* 417 F.2d 963, 969 (2d Cir. 1969); *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 940 (2d Cir. 1969); *Copperweld Corp. v. Imetal,* 403 F.Supp. 579, 595 (W.D.Pa.1975); *Mosinee Paper Corp. v. Rondeau,* 354 F.Supp. 686, 697–98 (W.D.Wis. 1973), *rev'd,* 500 F.2d 1011 (7th Cir. 1974), *rev'd,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975).

58. It has been held that when management personnel join with outside shareholders in an agreement to hold or acquire stock for the purpose of preserving control of a corporation, a Schedule 13D must be filed. *Jewelcor, Inc. v. Pearlman,* 397 F.Supp. 221 (S.D.N.Y.1975). Whether or not section 13(d) should be applied to such a group, the Court cannot accept ADDS' suggestion that a Schedule 13D must be filed when management personnel owning greater than five per cent of their corporation's equity shares "agree" with outsiders who as yet hold no shares to use management's stock to preserve them in control.

59. See *Corenco Corp. v. Schiavone & Sons, Inc.,* 488 F.2d 207, 218 (2d Cir. 1973); *Scott v. Multi-Amp Corp.,* 386 F.Supp. 44, 62 (D.N.J. 1974).

There remains the question of whether the balance of hardship tips in ADDS' favor so as to entitle it to enjoin the consummation of the sale of the shares to Racal pending a trial upon the merits.

Weighing in ADDS' favor is the fact that if the sale is not restrained its exchange proposal for all practical purposes is nullified, since its tax-free treatment is doomed. In the circumstances, ADDS will have been denied the opportunity to present its exchange offer to Milgo shareholders and have them consider it on its original terms and free of the impediments inherent in Racal's ownership of a large block of stock. The deprivation of that opportunity constitutes irreparable injury both to ADDS and Milgo shareholders.

On the other hand, deferring consummation of the sale of the shares until determination upon a full trial can have little impact upon Milgo, and even less on Racal. If defendants ultimately prevail, Milgo may possibly be deprived for a period of time of the capital sum involved, for which, as previously noted, the record indicates it has no immediate need. Moreover, the Bank of England's authorization for the transaction is valid for twelve months and there is no indication that this authorization will not continue in effect until November 19, 1977. The defendants themselves set the outside closing date for the transaction as March 31, 1977, four months from the date of the agreement. True, if the transaction were to be consummated now, the proceeds received by Milgo could be applied by it in reduction of outstanding bank loans or for corporate purposes with a savings of interest. Racal, to the extent that the transaction is delayed by any injunction, may suffer a loss on dividend income on the shares, if dividends are earned and declared by Milgo. These hypothetical monetary losses can be provided for by the undertaking required upon the issuance of an injunction under Rule 65(c) of the Federal Rules of Civil Procedure.

Finally, another factor which weighs against defendants and in favor of plaintiff is that the principal issue about which this litigation centers can readily and perhaps finally be put to rest fairly quickly. February 11, 1977 is the date of Milgo's next regular annual stockholders' meeting. The agreement for the sale of the shares to Racal, as well as a proposal to sell any additional new shares required for Racal to reach twenty per cent ownership, can be presented at that time for stockholder approval upon a full presentation of all material facts.

The Court finds that the balance of hardship weighs in ADDS' favor, and accordingly an injunction may issue restraining the consummation of the agreement for the sale of the shares. However, this injunction should not continue or the matter be kept in limbo indefinitely. While ADDS asserts that it has moved with extraordinary dispatch to present the exchange offer to Milgo shareholders, thus far the registration statement which was filed on December 13 has not become effective. Defendants, if entitled to consummate the agreement, should not be deprived of that right for an uncertain period. Accordingly, the injunction shall by its terms become inoperative on and after April 15, 1977, or such other date as the parties may agree upon. The injunction shall also restrain Milgo from making recommendations or solicitations to its shareholders with respect to the proposed exchange offer without first filing a Schedule 14D.

Submit order in accordance with the foregoing.