CROUSE–HINDS COMPANY, Plaintiff,

v.

INTERNORTH, INC. and I N Holdings,
Inc., Defendants.

No. 80–CV–772.

United States District Court,
N. D. New York.

Oct. 25, 1980.

Hancock, Estabrook, Ryan, Shove & Hust, Syracuse, N.Y., Sullivan & Cromwell, New York City, for defendants; Donald J. Kemple, Syracuse, N.Y., John L. Warden, Robert J. Katz, D. Stuart Meiklejohn, William L. Farris, New York City, of counsel.

Bond, Schoeneck & King, Syracuse, N.Y., Skadden, Arps, Slate, Meagher & Flom, New York City, for plaintiff; Charles T. Beeching, Syracuse, N.Y., Edwin E. McAmis, New York City, Rodney O. Thorson, Randy Mott, Washington D.C., Reid L. Ashinoff, New York City, of counsel.

## MEMORANDUM–DECISION

MUNSON, Chief Judge.

For the second time in two years, Syracuse, New York, and the surrounding area, has been the site of a major battle for corporate control. *See Carrier Corp. v. United Technologies Corp.*, [1978–2 Transfer Binder] Trade Cas. (CCH) ¶ 62,393 (N.D. N.Y. Dec. 6, 1978), *aff'd*, [1978–2 Transfer Binder] Trade Cas. (CCH) ¶ 62,405 (2d Cir. Dec. 18, 1978). In this instance, the struggle is for control of the Crouse-Hinds Company, which is the target of a hostile takeover attempt by InterNorth, Inc. and I N Holdings, Inc. (sometimes referred to collectively as InterNorth). These battles cut deep in this relatively small community, whose identity has been tied in no small measure to the security of local ownership of private enterprise. For this reason, most people in this community perceive these battles more in terms of their threat to such commonly shared values than their possible effect on financial security.

While the typical battle for corporate control eventually finds its way into the

courts, applicable laws in this area do not mandate a judicial assessment of the local repercussions of such struggles. Rather, under the present legislative scheme, a court is to act as a referee, whose duty it is to supervise the fight, and make certain that the contestants remain loyal to their benefactors—the shareholders. Should loyalties ever become divided, then the courts are required to intervene and realign the interests. Today the Court is required to perform just this task.

## II.

Presently before the Court is a motion by counterclaim-plaintiff InterNorth, Inc., for a preliminary injunction to enjoin counterclaim-defendant Crouse-Hinds from proceeding with an exchange of its stock with the Belden Corporation. A motion has additionally been made by Crouse-Hinds to dismiss InterNorth's counterclaim. Oral argument was heard by the Court on these motions on October 21, 1980, which was also the last day of the presentation of evidence in an involved and lengthy hearing on counterclaim-defendant's motion for injunctive relief to block a takeover attempt by Inter-North. A brief description of the protagonists and the factual background to this lawsuit follows.

Crouse-Hinds Company is a New York corporation with its headquarters in Syracuse, New York. The Company is engaged in the manufacture and marketing of electrical products consisting of electrical construction materials such as load centers, circuit breakers, meter mounts and safety switches; indoor and outdoor lighting fixtures and aviation ground lighting equipment; electrical wiring devices, specialty switches, and industrial controls; vehicular traffic control systems; and electrical distribution equipment, including switchboards, panelboards, switch gear, motor control centers, and bus ducts. Its assets as of December 31, 1979, totaled $152,475,-000.00, and its gross revenues for the year ending December 31, 1979 were $372,274,-000.00. Crouse-Hinds is the largest United States manufacturer of high quality electrical products, which are designed especially to provide mechanical protection against heavy or abusive service, and are principally used by heavy industries.

InterNorth, Inc. was incorporated under the laws of Delaware under the name Northern Natural Gas Company, whose name was changed to InterNorth in March of this year. Its principal offices are located in Omaha, Nebraska. I N Holdings, Inc. is a wholly owned subsidiary of InterNorth, Inc. and was created for purposes of the Crouse-Hinds acquisition. InterNorth operates as a parent corporation with five major operating companies. These divisions are referred to as Natural Gas, Liquid Fuels, Petrochemicals, Exploration and Production, and Coal. Natural Gas is engaged in the transmission and sale of natural gas to utilities serving 1,094 communities in seven midwestern states, and the retail distribution of natural gas in 319 cities and towns. Liquid Fuels is engaged in the acquisition, production, storage, transportation and marketing of natural gas liquids and petroleum products. Petrochemicals produces and markets plastic resins, plastic products and antifreeze-coolants. A significant portion of the feedstocks for Liquid Fuels and Petrochemicals is derived from the natural gas stream of Natural Gas. Appropriately entitled, Exploration and Production conducts exploration and production activities primarily to provide supplies of natural gas for Natural Gas's pipeline system, and to develop liquid hydrocarbon supplies for use in other operations of InterNorth. Coal has acquired some recoverable coal reserves and is engaged in the mining and marketing of coal from two mines. As of December 31, 1979, InterNorth had investment in property, plant, and equipment of more than $3 billion. Its gross revenues for the year ending December 31, 1979 were $2.5 billion.

The third active participant in this takeover drama is the Belden Corporation, an Illinois corporation, which is headquartered in Geneva, Illinois. Belden is engaged in the manufacture and sale of wire, cable and cords, and the distribution of electrical apparatus and equipment, through a wholly-

owned network of industrial-electrical supply and renewal part centers. As of December 31, 1979, Belden had assets of approximately $140 million. Belden's consolidated sales for the year ending December 31, 1979 were $291,354,000.00.

In July of 1980, Belden found itself the unwilling subject of a takeover attempt by the Ampco-Pittsburgh Corporation. This fact, and Belden's hostile reception, came to the attention of Crouse-Hinds, whose Chairman of the Board and Chief Executive Officer, Chris J. Witting, has been a director of Belden for the past seven years. Amicable and serious negotiations were subsequently commenced by Crouse-Hinds and Belden, with a view toward a "defensive" merger of the two companies.[1] On September 8, 1980, the Boards of Directors of Crouse-Hinds and Belden approved a merger agreement, and a public announcement to this effect was made the next day. Under the terms of the agreement, Belden is to merge with a Crouse-Hinds subsidiary—the Coppertime Corporation—based on an exchange ratio of one share of Belden for every 1.24 shares of Crouse-Hinds. The terms of the merger agreement would require Crouse-Hinds to issue approximately 3.4 million shares of its stock. Moreover, the merger would be subject to the approval of shareholders of both Crouse-Hinds and Belden. The merger agreement had been arrived at after considerable study and consultation by the Boards of Directors of both Crouse-Hinds and Belden with investment bankers and other experts. Each Board believed that the merger would serve the best interests of their Companies, and they therefore recommended that the merger agreement be ratified by the Crouse-Hinds and Belden shareholders. The decisions to merge by the Boards of Directors of Crouse-Hinds and Belden, and to recommend the merger to their shareholders, were made without any foreknowledge of the events to come.

The September 9, 1980 announcement of the Crouse-Hinds and Belden merger came as an unwanted surprise to InterNorth, which was at the final stage of the preparations for its tender offer to Crouse-Hinds' shareholders. InterNorth's tender offer for Crouse-Hinds marked the culmination of over a year of sophisticated analysis of possible acquisition candidates. Crouse-Hinds had been selected by InterNorth as best able to fulfill InterNorth's new diversification strategy, and its hope for continued financial vitality. For purposes of the present discussion, it suffices to say that shortly after learning of the Crouse-Hinds-Belden merger, InterNorth decided it did not want to tender for a Crouse-Hinds Company with a "Belden subsidiary."

Still, on the same day that the Crouse-Hinds and Belden merger was announced, the Board of Directors of InterNorth authorized the tender offer for Crouse-Hinds. A central condition of the merger was the termination or shareholder rejection of the Crouse-Hinds-Belden merger agreement.[2] Two days later, on September 11, 1980, InterNorth purchased one hundred shares of Crouse-Hinds stock on the New York Stock Exchange. On September 12, 1980, InterNorth publicly announced a tender offer for 6,700,000 shares of Crouse-Hinds common stock, or approximately 54% of the total shares outstanding, at a price of $40 per share. As planned, the cash tender offer was to be followed by a "second-step" merger of InterNorth and Crouse-Hinds in which the remaining Crouse-Hinds shareholders would be issued InterNorth preferred stock in exchange for their Crouse-Hinds common stock.[3]

Just as the Crouse-Hinds-Belden merger agreement was not favorably received by InterNorth, the InterNorth tender offer was unwelcomed news in the board rooms of Crouse-Hinds and Belden. In Belden's view, InterNorth's tender offer was de-

---

1. Less serious discussions had taken place over the past several years.

2. Like every condition of the tender offer this condition was waivable in the discretion of InterNorth.

3. The InterNorth offer originally commenced on September 12, 1980, and was to expire on October 2, 1980. It has been extended to October 31, 1980.

signed and intended to defeat the Belden merger, and thus deprive Belden and its shareholders of the concomitant business advantages that would flow to them from the combination of Crouse-Hinds and Belden. To protect its interests, on September 15, 1980, Belden brought an action against InterNorth in Illinois Circuit Court, and by an amended complaint, sought injunctive relief from InterNorth's allegedly tortious interference with the Crouse-Hinds-Belden merger. A temporary restraining order was entered by the court in that action, which enjoined InterNorth from proceeding with its tender offer. After a hearing, the court granted a second motion by Belden for a preliminary injunction, and further enjoined InterNorth from pursuing its tender offer pending a vote by Crouse-Hinds and Belden shareholders on the proposed merger agreement or until December 1, 1980, whichever is earlier. The Illinois court, moreover, ordered that the Crouse-Hinds and Belden shareholders must vote on the proposed merger prior to December 1, 1980. *Belden Corp. v. InterNorth, Inc.,* 90 Ill.App.3d 547, 45 Ill.Dec. 765, 413 N.E.2d 98 (Ill.Cir.Ct. Cook Co., October 1, 1980). On October 2, 1980, InterNorth filed a motion in the Illinois Appellate Court and asked for a stay of the injunction pending an emergency appeal, and this application was subsequently denied.

On September 16, 1980, four days after InterNorth announced its tender offer, the Crouse-Hinds Board of Directors met and decided that the InterNorth offer was inadequate, and not in the best interests of Crouse-Hinds and its shareholders. Consequently, the Board recommended that the Crouse-Hinds shareholders reject Inter-North's offer. The basis of the Crouse-Hinds Board of Directors' decision is described in a Schedule 14D–9 statement filed with the Securities and Exchange Commission, and is outlined in greater detail in the margin.[4] In part, the Board relied on an opinion by Lazard Freres & Co., that Inter-North's offered consideration was inadequate, the past performance and future earnings prospects of Crouse-Hinds, Crouse-Hinds' desire to complete the Crouse-Hinds and Belden merger, and the genuineness of InterNorth's intention to consummate its merger with Crouse-Hinds. On September 22, 1980, Crouse-Hinds filed this action[5] seeking injunctive relief on the grounds that the InterNorth tender offer was violative of federal securities laws and the New York Business Corporation Law. By amendment to the complaint, Crouse-Hinds also asserted that the tender offer was illegal under the federal antitrust laws. Crouse-Hinds promptly moved for injunctive relief, and on October 7, 1980, this Court commenced an extensive hearing on this motion. The matter is presently *sub judice.*[6]

In an effort to further protect the proposed Crouse-Hinds and Belden merger, Crouse-Hinds and Belden entered into additional negotiations, which resulted in an amendment to their original merger agreement on September 23, 1980. The amendment mandates that Crouse-Hinds would make the exchange offer, and provides for the issuance of Crouse-Hinds common stock in exchange for up to 1,733,871 shares of Belden common stock at the same 1.24:1 exchange ratio agreed to in the original merger agreement. If the exchange offer is successful, Crouse-Hinds will acquire 49%

---

**4.** The Board of Directors reached its conclusion by considering such things as:

    1. An opinion of the company's financial advisor;

    2. The company's business as a whole;

    3. The past, present and probable future performance of the company as an independent entity;

    4. A variety of financial criteria;

    5. The conditions of the offer;

    6. The uncertainty regarding the value and kind of consideration; and

    7. Advice by special counsel regarding legal questions.

**5.** Crouse-Hinds also filed petitions before the Federal Energy Regulatory Commission and the New York State Attorney General's Office, seeking review of InterNorth's actions.

**6.** The plaintiff also made a motion for expedited discovery, which this Court granted.

of the outstanding Belden shares. However, Belden also planned to call all of its outstanding 8%[7] convertible subordinated debentures, which could reduce this percentage to 39%. Subject to approval by the shareholders of both companies, the exchange offer will be followed by a merger of Belden with Crouse-Hinds, as originally intended. The exchange offer was commenced on October 3, 1980, and will remain open until October 31, 1980, unless extended or enjoined. Pursuant to federal securities regulations, Crouse-Hinds is permitted to purchase shares tendered on and after October 24, 1980.

Under the terms of the exchange agreement, should Crouse-Hinds acquire more than 350,000 shares of Belden under the exchange, or in the event that the merger is threatened by a large shareholder (presumably InterNorth) or not approved by the Crouse-Hinds and Belden shareholders, then the exchange agreement provides a variety of "stand still" restrictions on the resale of Crouse-Hinds' newly acquired Belden stock. Included among the restrictions are the following: (a) Crouse-Hinds cannot purchase additional Belden shares; (b) Crouse-Hinds will not seek additional representation on Belden's Board of Directors; (c) Crouse-Hinds shareholders will vote their shares in the same manner as the majority of Belden shareholders; (d) Crouse-Hinds cannot sell any Belden shares for a period of nine months after these restrictions become applicable unless Belden is given an opportunity to purchase such shares; (e) if Crouse-Hinds decides to distribute its Belden shares or exchange Crouse-Hinds shares for Belden shares, then no shareholder shall receive more than 5% of Belden shares held by Crouse-Hinds at the time of distribution or exchange unless such shareholder was the holder of more than 5% of the outstanding Crouse-Hinds shares as of the date of the exchange agreement; (f) Belden has the right, for a period of nine months after such restriction becomes applicable, to purchase all Belden shares held by Crouse-Hinds for a consideration equal to the per share value which any third party shall have offered to pay for all outstanding Belden shares; (g) the agreement may be terminated at any time prior to the acquisition of shares of Belden by mutual consent of the Boards of Directors of Belden and Crouse-Hinds and shall terminate upon the earlier of: (1) sale of all shares of Belden held by Crouse-Hinds, or (2) five years after the date of the agreement.[8]

The purpose of the exchange offer is in no way concealed by Crouse-Hinds. According to the prospectus that Crouse-Hinds issued in connection with the exchange offer, the purpose of the exchange offer is to acquire Belden shares

> as a first step in acquiring the entire equity interest in Belden pursuant to the Merger Agreement. . . . The issuance of a substantial number of Crouse-Hinds Shares pursuant to the Offer would also facilitate the Merger in that it would increase the amount of I N Securities it would have to issue in order to achieve its stated purpose of acquiring Crouse-Hinds, which in turn may have the effect of dissuading I N from continuing with the I N Offer.

Prospectus, p. 23. Elsewhere in the same document it is stated:

> The Boards of Directors of Crouse-Hinds and Belden approved the execution of the Exchange Agreement in order to facilitate consummation of the Merger in light of the I N [InterNorth] Offer and to discourage I N from continuing with the I N Offer. Since Crouse-Hinds will vote all Belden Shares it acquires pursuant to the Offer in favor of the Merger, the acquisition of a substantial number of Belden Shares pursuant to the Offer will increase the likelihood of approval of the Merger by Belden's shareholders. The issuance of a substantial number of Crouse-Hinds Shares pursuant to the Offer would also facilitate the Merger in that it would increase the amount of cash

---

7. The offer was not conditioned on any minimum number of shares being tendered.

8. Exchange Agreement § 3.03.

which I N would have to pay and the amount of I N securities it would have to issue in order to achieve its stated purpose of acquiring Crouse-Hinds, which in turn may have the effect of dissuading I N from renewing the I N Offer. *Id.* at p. 5.

The Prospectus also reveals the statistics that form the basis of Crouse-Hinds' hopes. As of September 16, 1980, there were 12,-233,733 Crouse-Hinds shares outstanding, 363,376 Crouse-Hinds shares reserved for issuance upon conversion of Crouse-Hinds' preferred stock, and 331,302 Crouse-Hinds' shares reserved for issuance upon exercise of stock options. If InterNorth purchases 6,700,000 Crouse-Hinds shares pursuant to the InterNorth offer, it would own approximately 52% of the 12,928,411 Crouse-Hinds shares outstanding or reserved for issuance. However, if all 2,150,000 Crouse-Hinds shares are issued pursuant to the exchange agreement, then InterNorth's percentage would be reduced to approximately 44%.[9]

While the Belden Board of Directors approved the exchange agreement because it would facilitate the merger with Crouse-Hinds, they would not recommend the exchange agreement to Belden shareholders. The Belden Board made the following statement on this issue.

> The Board of Directors of Belden recognizes that there is uncertainty as to whether the Merger will be effected in accordance with its terms because of, among other things, the opposition of I N. Accordingly, the Belden Board has made no recommendation as to whether or not shareholders should tender their shares for exchange and each shareholder is advised to review this Prospectus carefully to make his or her own decision. The Belden Board, however, approved the Exchange Agreement because in its judgment the Offer facilitates the Merger and gives those shareholders desiring to exchange Belden Shares for Crouse-Hinds Shares the opportunity to do so.

Prospectus, p. 14. In part, the Belden Board of Directors' decision not to recommend the exchange was attributable to the fact that its investment banker, Goldman Sachs, could not express any opinion "as to the fairness of the Offer to Belden's shareholders as a transaction separate and apart from the Merger," because of its uncertainty as to whether the merger would be effected due to the opposition of InterNorth. Prospectus, at p. 14.

To complete this background discussion, it should be noted that two procedural requirements must be complied with by Crouse-Hinds before it would legally be able to consummate the stock exchange with Belden, and whether these requirements have been satisfied by Crouse-Hinds is disputed by InterNorth. First, Crouse-Hinds has yet to amend its certificate of incorporation in order to permit it to issue the 5.5 million shares contemplated by the merger agreement. At present, the certificate only allows Crouse-Hinds to issue 18 million shares of stock. The sum total of the present shares outstanding and the shares to be issued under the proposed merger and exchange would exceed this figure. A vote on this issue is scheduled for the next Crouse-Hinds shareholders' meeting. Second, the Delaware General Corporation law requires that a statement of intention to make a tender offer must be delivered at least 20 days prior to commencement of a tender offer, and that a tender offer must remain open for a period of at least 20 days after it is first made, during which period shareholders may withdraw any tendered securities. The Delaware statute also provides that any revised or amended tender offer which changes the amount or type of consideration offered, or the number of equity securities for which the tender offer is made, shall remain open for an additional period of at least ten days following the amendment. Thus, under the Delaware statute, no exchange of tendered securities may be made during such 20 and 10 day periods. On September 22, 1980, and "without conceding the constitutionality of the Delaware statute," Crouse-Hinds delivered to Belden formal written notice of its

**9.** Exchange Prospectus at p. 11.

intention to make the exchange, "which notice confirmed prior discussions between the parties (and consequently notice of the possibility of the Offer) on September 13, 1980." Prospectus, p. 23.

### III.

InterNorth filed an answer and counterclaim in this action on October 3, 1980. That same day, and based on its counterclaim, it applied to this Court for a temporary restraining order against the exchange offer being made by Crouse-Hinds for the stock of Belden. In an Order dated October 4, 1980, the Court held that, although InterNorth had "shown sufficiently serious questions going to the merits as to make them fair grounds for litigation," it had not demonstrated that "as a shareholder of Crouse-Hinds, it will suffer immediate and irreparable injury, loss or damage if the Exchange Offer is not enjoined at this time." InterNorth's request for a temporary restraining order was denied, but the Court ordered Crouse-Hinds to show cause on October 7, 1980, why a preliminary injunction should not be entered on October 24, 1980, the earliest date, pursuant to the terms of the exchange offer, on which Crouse-Hinds could exchange for Belden shares.

Stated in brief, counterclaim-plaintiff InterNorth claims that the Crouse-Hinds exchange for Belden stock is designed solely by the Board of Directors of Crouse-Hinds as a means to retain their corporate control of Crouse-Hinds in the face of InterNorth's tender offer. As such, InterNorth asserts that the exchange is without valid corporate purpose and designed solely to defeat InterNorth's tender offer (due to the "Belden condition" of that tender offer) and violates the business judgment rule. In addition, InterNorth maintains that, due to the restrictive "stand still" provisions of the exchange, large-scale corporate waste will result if Crouse-Hinds shareholders ultimately choose to vote against the merger with Belden. InterNorth further argues that the exchange will effectively deprive InterNorth and other Crouse-Hinds shareholders of their right to vote on the merger. Finally, InterNorth says that the exchange violates applicable provisions of Delaware law.[10]

Crouse-Hinds vigorously opposes InterNorth's motion and has moved to dismiss InterNorth's counterclaim. According to Crouse-Hinds, this Court lacks subject matter jurisdiction over the counterclaim because it is permissive and not compulsory; and not supported by ancillary jurisdiction. Moreover, Crouse-Hinds claims that the counterclaim should be dismissed for failing to join Belden, which, it is maintained, is an indispensable party to this counterclaim. Crouse-Hinds further asserts that InterNorth lacks the capacity to bring this action which it describes as a "shareholder derivative action." Despite these procedural arguments, if the Court does reach the merits of InterNorth's counterclaim, Crouse-Hinds claims that its Board of Directors is protected by the business judgment rule. The Court will now turn to a more detailed examination of these arguments. But, before the Court can address the merits of InterNorth's motion for a preliminary injunction, it must first consider Crouse-Hinds' arguments with respect to subject matter jurisdiction, indispensable parties, and standing. If any of these questions ought to be resolved in favor of Crouse-Hinds, then the Court need not reach the merits of InterNorth's motion and Crouse-Hinds' motion to dismiss should be granted.[11]

Crouse-Hinds' first argument addresses the issue of whether this Court has the power to assert subject matter jurisdiction over InterNorth's counterclaim. In the instant case, the Court's ability to consider InterNorth's counterclaim, in Crouse-Hinds' view, turns on the characterization of this claim as a "compulsive" or "permissive" counterclaim. Fed.R.Civ.P. 13(a) and (b). The Court will further summarize the parties' arguments on this issue in a moment.

---

**10.** *See* amended complaint and specifically Delaware General Business Law § 203.

**11.** *See* Fed.R.Civ.Pro. 12(b)(1), (7).

But first, in order that they may be better understood, the Court will marshal the relevant law.

It is a fundamental precept that federal courts are courts of limited jurisdiction, *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 374, 98 S.Ct. 2396, 2402, 57 L.Ed.2d 274 (1978), and may only consider claims over which it has subject matter jurisdiction. A corollary to this rule, however, is the concept of ancillary jurisdiction, which provides that a federal court acquires jurisdiction over an entire case or controversy, and therefore may resolve matters raised by the case of which it could not take cognizance were they presented independently. Wright & Miller, *Federal Practice and Procedure,* § 3523 (1975). Thus, under its ancillary jurisdiction, a federal court may hear non-federal claims arising out of the federal claim which initially confers jurisdiction on the court. The connection between the federal and non-federal claims should reveal a "direct relation to property or assets actually or constructively drawn into the court's possession or control by the principal suit." *Aldinger v. Howard,* 427 U.S. 1, 11–12, 96 S.Ct. 2413, 2418–19, 49 L.Ed.2d 276 (1976). In effect, a federal court's ancillary jurisdiction enables it to do complete justice, and is a common sense solution to the problems of piecemeal litigation. Wright & Miller, *supra.*

■ The question of the proper exercise of a federal court's ancillary jurisdiction is frequently raised when a defendant asserts a non-federal counterclaim. The leading case in this area is *Moore v. New York Cotton Exchange,* 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926), which has been cited for the general proposition that a federal court has ancillary jurisdiction over a compulsory counterclaim since, by definition, it arises out of the same transaction or occurrence that is the subject matter of the opposing party's claim.[12] *Baker v. Gold Seal Liquors, Inc.,* 417 U.S. 467, 468 n. 1, 94 S.Ct. 2504, 2506 n. 1, 41 L.Ed.2d 243 (1974); *Federman v. Empire Fire and Marine Ins. Co.,* 597 F.2d 798 (2d Cir. 1979); *Harris v. Steinem,* 571 F.2d 119, 121–22 (2d Cir. 1978). For purposes of defining a compulsory counterclaim, the phrase "same transaction or occurrence" is to be defined by considering whether there are (1) identity of facts between the original claim and counterclaim; (2) mutuality of proof; and (3) a logical relationship between the original claim and counterclaim. While these factors are considered indicative of the compulsory nature of a counterclaim, "no one of them is conclusive and should not be relied on exclusively." *Federman v. Empire Fire and Marine Ins. Co., supra,* at 812. If a counterclaim does not meet this test for being compulsory, then it is "permissive," and a district court may only exercise ancillary jurisdiction over it if there exists some independent basis of federal jurisdiction. *Id.* at pp. 812–813.

Counterclaim-defendant Crouse-Hinds asserts that InterNorth's counterclaim does not arise out of the same transaction or occurrence which gave rise to the principal

12. The facts in *Moore* included plaintiff's claim that defendant violated the antitrust laws by refusing to provide plaintiff with a quotation service, and defendant's counterclaim that plaintiff was stealing quotations from defendant in order to run his own operation. In defining the term "transaction," the Supreme Court held:

"Transaction" is a word with a flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship. The refusal to furnish the quotations is one of the links in the chain which constitutes the transaction upon which appellant here bases its cause of action. It is an important part of the trans-

action constituting the subject-matter of the counterclaim. It is the one circumstance without which neither party would have found it necessary to seek relief. Essential facts alleged by appellant enter into and constitute in part the cause of action set forth in the counterclaim. That they are not precisely identical, or that the counterclaim embraces additional allegations, as for example, that appellant is unlawfully getting the quotations, does not matter. To hold otherwise would be to rob this branch of the rule of all serviceable meaning, since the facts relied upon rarely, if ever, are, in all particulars, the same as those constituting defendant's counterclaim.

claim of Crouse-Hinds.[13]  More specifically, Crouse-Hinds argues that the exchange offer is an entirely different and independent transaction, which does not involve Inter-North at all.  Crouse-Hinds asks the Court to view the exchange offer as an event prior in time to the tender offer, which it maintains involves different parties, objectives, time tables, and contemplates a different merger and combined entity as designed by different people.  As a consequence, Crouse-Hinds claims that there is no identity of facts between the original claim and the counterclaim, nor do they have a logical connection.  It is further claimed by Crouse-Hinds that, due to the different legal claims involved in the original claims and counterclaims, InterNorth cannot satisfy the "mutuality of proof" requirement of Rule 13(a).  The instant case, as Crouse-Hinds points out, involves its claims of securities and antitrust violations, while InterNorth's claim is under common law principles.  This is not the type of counterclaim, says Crouse-Hinds, that grows out of the original claim in such a way "that it only needs the failure of the former to establish a foundation for the latter. . . ."  *Moore v. New York Cotton Exchange*, 270 U.S. 593, 610, 46 S.Ct. 367, 371, 70 L.Ed. 750 (1926).  In sum, Crouse-Hinds claims that InterNorth's counterclaim does not satisfy any of *Federman's* criteria for defining a compulsory counterclaim, and that therefore it must be adjudged a permissive counterclaim, which is without the jurisdiction of the Court.

■  InterNorth counters by characterizing its counterclaim as within the meaning of "same transaction or occurrence," in that the subject matter of Crouse-Hinds' principal claim, as well as the counterclaim grow out of the battle for corporate control of Crouse-Hinds.  Thus, argues InterNorth, these transactions are "the same transaction" within the meaning of *Moore's* "series of events" definition, and would pass muster under the *Federman* criteria.  Inter-North asserts that the factual and logical relationship is demonstrated by the prospectus filed by Crouse-Hinds and Belden which accompanied their exchange offer, and where it is conceded that their boards of directors "approved the execution of the Exchange Agreement in order to facilitate consummation of the Merger in light of the I N offer and to discourage I N from continuing with the I N offer."  Prospectus, pp. 5–6.  Since Crouse-Hinds' original claim in this lawsuit solely addresses the legality of InterNorth's offer, InterNorth argues that the "same transaction" test is satisfied.  Moreover, it is asserted that a logical relationship exists because the right InterNorth seeks to protect here is based on the Crouse-Hinds shareholders' right to freely choose between InterNorth's offer and the Belden merger.  The court must agree with Inter-North.

The "transaction" at issue in the present case is the question of the fight for the corporate control of Crouse-Hinds.  Since this decision normally lies with the shareholders of any target company, a counterclaim which challenges the actions of target management allegedly aimed at restricting that right to insure that they selfishly retain control of that company, satisfies both the factual and logical elements of the "same transaction" test.  In the present case, it is difficult to see how the facts could be more related either in terms of "identity" or logically related.  Crouse-Hinds' own papers reveal that it is necessary to explain the exchange agreements' relationship to both the merger agreement, and InterNorth's tender offer, in order to appreciate the relevant facts of this action.  Furthermore, the Belden exchange cannot be understood without reference to the

---

13.  In part, Crouse-Hinds' argument on the compulsory counterclaim issue relies on its view that InterNorth's counterclaim is a shareholder's derivative action.  The Court disagrees with this characterization.  Counterclaims of this variety, in which a corporation sues as a shareholder challenging the business judgment of target management in fending off a takeover, is a right personal to the corporate shareholder.  This issue is more thoroughly analyzed (*infra* at p. 403).  For this reason, Crouse-Hinds' argument that InterNorth is not an "opposing party" within the meaning of Rule 13(a) does not merit further consideration.

question of whether Crouse-Hinds' shareholders were being forced through this exchange to vote in favor of a Belden merger. In closing arguments on this issue, counsel for Crouse-Hinds explains the relevance of the exchange agreement to this lawsuit as follows: "I submit that all that is being talked about here is a method by which Crouse-Hinds' Board of Directors ultimately decided to protect its Belden deal." Transcript at pp. 853–54. A moment later he states:

> If the Crouse-Hinds Board of Directors decided that Belden was a good deal, and they clearly did, then I submit they were legally entitled to take proper steps to try to insure that that deal came to fruition, that it was consummated, and that's what went on; to do it in a way that is now proposed, simply gives some added assurance that the transaction will ultimately be accomplished and I think that the legal mechanics are such that they can be accomplished promptly, but it in no way keeps InterNorth from making a proper offer for Crouse-Hinds.

Transcript at p. 853. Whether Crouse-Hinds will ultimately prevail in this matter is of no concern to the compulsory counterclaim issue. What is significant is that the struggle for control of Crouse-Hinds is composed of a series of occurrences that must be explained together in order to understand the logic of events in that struggle. *See Moore v. New York Cotton Exchange, supra.* The "method" used by Crouse-Hinds to give it some "added assurance" that the merger with Belden would succeed, and InterNorth discouraged in its takeover attempt, must be viewed as one of these occurrences. As part of that "same transaction," InterNorth has filed a counterclaim challenging Crouse-Hinds' methods and motivation.

A similar set of circumstances was involved in the case of *Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357 (2d Cir. 1980). The Treadway Company and five of its directors had sued Care Corporation, which had acquired nearly 31% of Treadway's common stock, including a large block purchased from a third party Cowin. As-

serting that Care and Cowin had conspired with two Treadway Directors to seize control of Treadway by unlawful means, Treadway sought an order requiring Care to divest itself of its stock and requiring all defendants to account to Treadway for their profits. Care filed counterclaims seeking to enjoin the issuance and sale of 230,000 Treadway shares to a third company, on the ground that Treadway's board had approved the sale for the sole purpose of perpetuating its control over the corporation.

While the Court of Appeals did not consider the question of whether Care's counterclaim was compulsory or permissive, *Treadway* is indicative of the appropriateness of managing lawsuits for corporate control through the use of counterclaims. The battle for corporate control involves the use of myriad defensive tactics by target management, only limited in variety by the imagination of management and its counsel. *See* Lynch and Steinberg, *The Legitimacy of Defensive Tactics in Tender Offers,* 64 Cornell Law Review 901, 902 (1979). To avoid piecemeal litigation, the concept of ancillary jurisdiction should be applied with sufficient flexibility to enable the legality of such defensive tactics to be considered in the same forum that considers the merits of a defensive lawsuit filed by target management. As a result, the "mutuality of proof" element cited in *Federman* should be read as being broad enough to accommodate these realities. In *Treadway,* for example, the principal claim involved federal securities claims, and state claims involving the fiduciary duties of a board member. The counterclaim alleged a violation of a state statute which codifies the business judgment rule.

Finally, in this regard, Crouse-Hinds claims that the instant case falls within an exception to Rule 13(a) which provides that any claim which "at the time the action was commenced . . . was the subject of another pending action" is not a compulsory counterclaim. Crouse-Hinds contends that the case of *Belden Corp. v. InterNorth* was pending at the time the instant action was

commenced, and that the very issue contested here, the fairness of the merger to the shareholders of one of the constituent companies, is also the subject of the Illinois action. The Court does not accept Crouse-Hinds' characterization of the present action, nor its reading of Rule 13(a). As is discussed *infra* at footnote 14, the present counterclaim concerns Crouse-Hinds' legal capacity to enter into the exchange agreement. From the Court's understanding of the Illinois action, it is not related to Inter-North's claim that the Crouse-Hinds' Board of Directors violated the business judgment rule, and as a result were without authority to enter into the exchange agreement. In addition, as a general proposition, the "pending action" provision of 13(a) is intended to protect a defendant from having to assert any counterclaim that is already before another court at the time plaintiff institutes the initial action. Wright & Miller, *Federal Practice and Procedure* ¶ 1411 (1971). Thus, Rule 13(a) is not even re-

motely applicable to this case. In conclusion, InterNorth's counterclaim is compulsory within the meaning of Fed.R.Civ.P. 13(a).[14] The next issue to be examined is whether InterNorth has standing to bring its counterclaim.

## IV.

■ The second thrust of Crouse-Hinds' motion to dismiss is that InterNorth is without standing to maintain this lawsuit. InterNorth's position on the standing issue is a bit confusing, and requires some extrapolation. InterNorth asserts that it has standing to challenge Crouse-Hinds Board of Directors' actions with respect to the exchange on two separate grounds. The first is as a shareholder of Crouse-Hinds in a "personal action," and not through a "shareholder's derivative" action. The second basis for standing claimed by Inter-North is as a tender offeror whose commercial interest in the actions taken by the

14. Crouse-Hinds further argues that Inter-North's counterclaim must be dismissed for failure to join Belden as an indispensable party as provided for in Fed.R.Civ.P. 19(a). It is first asserted that even if Belden were to be joined as a party in this action, the Court would be without jurisdiction because Belden's presence would defeat the counterclaim's independent basis of jurisdiction due to a lack of diversity of citizenship. However, based on the court's ruling that InterNorth's counterclaim is compulsory, this claim need not detain our inquiry very long. An independent basis for jurisdiction is not required for a compulsory counterclaim because jurisdiction is predicated upon the principal claim. *See Federman, supra*, at 810; 3 Moore's Federal Practice ¶ 13.15 (1979).

The second argument advanced by Crouse-Hinds is that Belden should be joined as an indispensable party, *see* Fed.R.Civ.P. 19, because its stake in the merger agreement makes it an interested party. Crouse-Hinds claims that due to the fact that the exchange affects the likelihood of success of the merger agreement, Belden's interest in this action is equal to that of Crouse-Hinds. Moreover, Crouse-Hinds asserts that if Belden is not made a party to this action, the latter's ability to preserve for itself and its shareholders the benefits of the merger agreement will be impaired, and thus its joinder is mandatory.

To a great extent Crouse-Hinds mischaracterizes Belden's rights in this action. Belden's ability to proceed with its merger agreement with Crouse-Hinds is not legally jeopardized by InterNorth's counterclaim. First of all, Inter-

North does not challenge the rights of Belden or Crouse-Hinds for that matter, to hold shareholders meetings and vote on the proposed merger. Crouse-Hinds is correct in saying that InterNorth's claim on the efficacy of the exchange does go to the likelihood of the merger agreement succeeding. Still, Crouse-Hinds does not maintain, nor could it, that it or Belden are possessed of a right to the success of a merger by any means. Obviously the methods employed to achieve a merger must be legal, and neither Belden or Crouse-Hinds is entitled to benefit from the illegal conduct of the other.

Consequently, Belden would not be entitled to benefit from the exchange agreement if Crouse-Hinds had no authority under law to enter into it in the first instance. In this sense, the question raised by InterNorth's counterclaim is the legal capacity of Crouse-Hinds to strike the exchange agreement. The resolution of this claim is peculiar to Crouse-Hinds and its shareholders. Any rights Belden may have in the exchange agreement, which is executory in any event, are conditioned on this initial determination. At the present stage in the proceedings, Belden's interest is merely financial not legal, and thus it is not an indispensable party. *See* Moore's *Federal Practice* ¶ 19.07–1[2]. Under this same principle, Crouse-Hinds' claim that Coppertime is also an indispensable party must fail. In an action against a parent company, it is not necessary to join the subsidiary. *Id.*

Crouse-Hinds board in response to Inter-North's tender offer is at stake. Inter-North's standing as a shareholder will first be addressed.

Although counsel for InterNorth had initially suggested that the basis for standing in its counterclaim was a shareholders' derivative action, it has since regrouped its forces and now maintains that it brings this action based upon an injury to it as a shareholder individually, and not with a view toward recovering for a distinct injury suffered by the Crouse-Hinds Company. Crouse-Hinds claims that, while InterNorth has not been "explicit" with regard to its asserted basis for standing, InterNorth could not rightfully maintain a derivative action because it has not complied with applicable state and federal requirements governing such actions. *See* New York Business Corporation Law § 626(c) (McKinney 1963); and Fed.R.Civ.P. 23.1. To resolve this question, a closer examination of InterNorth's claims is in order. Before doing so, however, the law in this area will be analyzed.[15]

As reaffirmed by the Supreme Court in *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968), *quoting Baker v. Carr*, 369 U.S. 186, 194, 82 S.Ct. 691, 697, 7 L.Ed.2d 663 (1962), the issue of standing relates directly to the Constitution's limitation on the judicial power of an Article III court to only adjudge actual "cases and controversies":

> The "gist of the question of standing" is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends . . . ."

*Accord, Evans v. Lynn*, 537 F.2d 571, 591 (2d Cir. 1976) (en banc). A shareholder's financial interest in a corporation provides two separate grounds for standing to challenge the actions of a board of directors

depending upon the nature of the asserted claim. In one type of action, a shareholder sues the corporation solely in a personal capacity and complains that the acts of the corporation, its officers or third persons, have undermined the rights of the shareholders to exercise their relative voice in corporate affairs. *See Eisenberg v. Flying Tiger Line, Inc.*, 451 F.2d 267, 271 (2d Cir. 1971); *Horwitz v. Balaban*, 112 F.Supp. 99, 101 (S.D.N.Y.1949); 13 Fletcher, *Cyclopedia of Corporations*, ¶ 5908, 5911 (Perm.Ed. 1970).

■ The second type of shareholder suit is a derivative action which arises out of a "primary right of a corporation but which is asserted on its behalf by the stockholder because of the corporation's failure, deliberate or otherwise, to act upon the primary right." *Schreiber v. Butte Copper & Zinc Co.*, 98 F.Supp. 106, 112 (S.D.N.Y.1951) (Weinfeld, J.). Business Corporation Law § 720 (McKinney 1963); *Syracuse Television, Inc. v. Channel 9, Syracuse, Inc.*, 51 Misc.2d 188, 273 N.Y.S.2d 16, 23 (Sup.Ct. Onon.1966). In a derivative action, the corporation is viewed as the "real party in interest and [the shareholder] is allowed to act in protection of its interest somewhat as a 'next friend' might do for an individual, because it is disabled from protecting itself." *Koster v. Lumbermens Mutual Co.*, 330 U.S. 518, 523, 67 S.Ct. 828, 831, 91 L.Ed. 1067 (1947). In distinguishing between a personal and derivative action, a court is required to look to the plaintiff's complaint. *Beloff v. Con. Ed. of N.Y.*, 81 N.Y.S.2d 440 (Sup.Ct.N.Y.1948) *aff'd* 300 N.Y. 11, 87 N.E.2d 561 (1949); Fletcher, *supra*, at ¶ 5912. It should be further noted that because the shareholders are possessed of a right to have the corporate property managed in their interest, any shareholder may bring an action to enjoin the misapplication of its assets, or to enjoin ultra vires acts. Fletcher, *supra* at ¶ 5915.1.

InterNorth claims that the exchange agreement entered into by Crouse-Hinds

---

15. InterNorth's standing to sue concerns the relationship between a shareholder and its company. It is therefore governed by the law of the state of Crouse-Hinds' incorporation,

New York. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975).

was motivated solely for the purpose of protecting its own position, and with the effect of denying InterNorth the opportunity to proceed with its tender offer for the shares of Crouse-Hinds. As such, InterNorth asserts that the conduct of Crouse-Hinds' Board of Directors violated the business judgment rule because it was lacking in a valid corporate purpose, deprived the Crouse-Hinds' shareholders of their statutory right to vote on the Belden merger, was ultra vires, and because it violated the Delaware General Corporation Law 8 § 203. Crouse-Hinds rejoins by arguing that the real basis of InterNorth's claim "is in essence one of waste or potential diminution of the value of corporate assets, to the detriment of Crouse-Hinds and its shareholders, including InterNorth." Memorandum of Crouse-Hinds in Further Support of its Motion to Dismiss, at p. 4. Such a claim, Crouse-Hinds maintains, is grounded in an injury to the corporation and not a personal injury to any shareholder, and must be brought as a derivative action. Crouse-Hinds claims that InterNorth could not properly bring a derivative action because, as a tender offeror, it cannot possibly "fairly and adequately" represent the other Crouse-Hinds shareholders as mandated by Fed.R.Civ.P. 23.1. Finally on the standing issue, Crouse-Hinds claims that InterNorth has no standing to challenge a Delaware takeover notice provision which is aimed at protecting a target company, and not a tender offeror. For these reasons, Crouse-Hinds believes that InterNorth's counterclaim must be dismissed for lack of standing. The Court does not agree.

■ Crouse-Hinds' argument reflects a misunderstanding of the nature of InterNorth's counterclaim. It is by now a well settled proposition that in the struggle for corporate control, a tender offeror may assert standing to challenge the actions of the target management exercised in the course of defending against the offer. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Treadway Companies, Inc. v. Care Corp.*, 638 F.2d 357 (2d Cir. 1980) (defensive sale and business judgment rule); *Klaus v. Hi-Shear*

*Corp.*, 528 F.2d 225 (9th Cir. 1975) (stock dilution and business judgment rule); *Applied Digital Data Systems v. Milgo Electronic*, 425 F.Supp. 1145 (S.D.N.Y.) (Weinfeld, J.) (Section 14e, defensive sale and business judgment rule); *Crane Co. v. Anaconda Co.*, 411 F.Supp. 1208 (S.D.N.Y.1975) (defensive sale as corporate waste); *Northwest Industries, Inc. v. B.F. Goodrich Co.*, 301 F.Supp. 706 (N.D.Ill.1969) (defensive sale and business judgment rule); *Condec Corp. v. Lunkenheimer Co.*, 230 A.2d 769 (Del.1967) (defensive sale and business judgment rule). As is readily apparent from the above-cited case support, many of these actions involved a target's use of a defensive sale to defeat a merger, the implications of that act under the business judgment rule, and a concrete injury flowing therefrom, such as vote dilution. Nevertheless, each plaintiff commenced the action and asserted standing through a personal—not derivative—shareholder's action.

■ Furthermore, Crouse-Hinds' claim that InterNorth is truly bringing a derivative action fails to take account of InterNorth's burden of proof under the business judgment rule. Once a plaintiff establishes that a board member was interested in a disputed transaction, the burden shifts to a defendant board member to "show that the transaction was fair, in the sense that it was entered into for a proper corporate purpose." *Treadway Companies, Inc. v. Care Corp., supra*, at 382. InterNorth's argument with respect to the corporate waste involved in the "stand still" provisions of the exchange agreement is not intended to represent the basis for its standing claim. Rather, it is an offer of proof to the question of the corporate purpose reflected in the exchange agreement. Lastly, Crouse-Hinds' claim with respect to InterNorth's lack of standing to challenge a violation of Delaware General Corporation Law 8 § 203 is without merit. It has already been said that any shareholder has standing to challenge a corporation's violation of the law as being an ultra vires act. New York Business Corporation Law § 203 (McKinney 1963); *Jaffe Plumbing & Heating Co. v.*

*Brooklyn Union Gas Co.*, 51 Misc.2d 1083, 275 N.Y.S.2d 24, *aff'd*, 26 N.Y.S.2d 851, 309 N.Y.S.2d 597, 258 N.E.2d 93 (1966).[16] The next issue to be addressed, and somewhat duplicative to the standing issue, is Inter-North's entitlement to a preliminary injunction.

## V.

There are two alternate tests in the Second Circuit for the issuance of a preliminary injunction. Both tests require a finding of irreparable harm, and make different demands on a plaintiff in terms of the proof needed to show potential success on the merits. The test is stated as follows:

> (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Seaboard World Airlines, Inc. v. Tiger International, Inc.*, 600 F.2d 355, 359–60 (2d Cir. 1979); *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (per curiam); *Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 758 (2d Cir. 1979); *Caulfield v. Board of Education*, 583 F.2d 605, 610 (2d Cir. 1978); *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1358 (2d Cir. 1976). The merits of Inter-North's claim will first be examined.

### A. Merits

InterNorth asserts that the exchange of stock between Crouse-Hinds and Belden was intended primarily as a means to enable Crouse-Hinds' directors to retain control of their Company in the face of Inter-North's tender offer. As such, InterNorth claims that in perpetrating the exchange, the Crouse-Hinds directors have acted without a valid corporate purpose, in bad faith, and therefore in contravention of the standards of conduct outlined in the business judgment rule. This corporate law principle, which will be examined in greater detail momentarily, is used as a judicial tool to evaluate the propriety of directors' actions.

The thrust of InterNorth's proof is that the exchange serves no legitimate corporate purpose. While InterNorth concedes that the exchange will facilitate the proposed Crouse-Hinds and Belden merger, it asks the Court to look beyond this stated rationale. InterNorth maintains that the exchange usurps the province of the Crouse-Hinds shareholder in that it renders the proposed Crouse-Hinds and Belden merger a foregone conclusion. It will be recalled that Crouse-Hinds has disclosed in a joint Crouse-Hinds-Belden prospectus that it intends to vote any Belden shares it obtains via the exchange in favor of the merger. The prospectus further has revealed that Crouse-Hinds hoped that this result would discourage InterNorth from pursuing its tender offer. InterNorth points to these admissions as revealing evidence of the fact that "facilitation" of a Crouse-Hinds merger is nothing less than a code word which barely masks the intent of the Crouse-Hinds directors to minimize both the likelihood that the InterNorth tender offer would succeed and the attendant risk that the Crouse-Hinds board of directors would be removed from office. However, Inter-

---

**16.** The Court's conclusion that InterNorth may properly assert standing as a shareholder makes a ruling on its standing as a tender offeror unnecessary. Nonetheless, without reaching the merits of that issue, the Court agrees with Crouse-Hinds that there would appear to be no common law or New York State statutory basis to support InterNorth's claim. A federal cause of action for a violation of Section 14(e) of the Williams Act, 15 U.S.C. § 78n(e), had been available to a tender offer. *See Applied Digital Data Systems v. Milgo Electronic*, 425 F.Supp. 1145 (S.D.N.Y.1977). This avenue would likely be foreclosed to a tender offeror by a recent decision of the Supreme Court, where, as is the case here, the challenged conduct of target management is unrelated to questions of "full disclosure." *See Piper v. Chris Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). (Examines legislative intent of 14(e) and rejects tender offeror's standing to sue a target company for damages); *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (recognizes 14e's "manipulative and deceptive acts provision as a term of art and as proscribing such acts where they are disclosure related).

North claims, while attempting to minimize this latter risk, the Crouse-Hinds directors have illegally stifled the voices of the Crouse-Hinds shareholders in the operation of their company.

In the InterNorth scenario, Crouse-Hinds' counter-attack to the InterNorth tender offer had just begun. The next order of business was to coax Belden into an exchange agreement because, in the words of the joint prospectus, it "would increase the amount of cash which IN would have to pay and the amount of IN securities it would have to issue in order to achieve its stated purpose of acquiring Crouse-Hinds, which in turn may have the effect of dissuading IN from continuing with the IN Offer." Prospectus, at p. 21. The incentive employed by Crouse-Hinds was the "stand-still" provisions of the exchange agreement, which have already been summarized, *supra,* at pp. 395–396. While the "stand-still" provisions would make the exchange agreement very tempting for Belden, which was itself the target of a hostile takeover attempt by Ampco-Pittsburg, InterNorth claims that the premium paid on these "sterilized" shares was to the severe detriment of Crouse-Hinds. InterNorth asserts that if the "restriction" clause of the exchange agreement was to be triggered by one of the enumerated conditions such as the failure of the merger, then Crouse-Hinds would be stuck with "sterilized" shares which, for the most part, would be unmarketable. In other words, Crouse-Hinds would have paid a premium for Belden shares under the exchange agreement, only to be forced under the resale terms of that same agreement, to sell those "sterilized" shares at a substantial loss. InterNorth argues that no rational business purpose would be served by the management's exposure of Crouse-Hinds to such a substantial loss. In the absence of any business purpose, InterNorth contends the terms of the exchange agreement could only have been designed to insure that the Crouse-Hinds' directors would move a step closer toward insuring the longevity of their tenure and their goal of discouraging the InterNorth tender offer.

According to InterNorth, the final barrier to the Crouse-Hinds directors' counter-offensive was procedural. The problem in this regard was two fold. First, with the addition in the market place of 5.5 million shares of Crouse-Hinds' stock that would be required to meet the terms of the exchange *and* merger agreements, Crouse-Hinds would have to amend its certificate of incorporation. In its present form, the Crouse-Hinds' certificate of incorporation only permits the issuance of 18 million shares of Crouse-Hinds' stock. The merger agreement, however, contemplates a total of some 18.5 million shares outstanding. Under the second part of the InterNorth scenario already outlined, the increase could readily be accomplished because the typical Crouse-Hinds shareholder—when faced with the dilemma of voting for the amendment or the possibility that the merger will not go through and thus triggering the "stand-still" provisions—will vote in favor of amending the certificate of incorporation. Nevertheless InterNorth asserts that this strategy violates Business Corporation Law § 801 (McKinney 1963), which provides that a certificate of incorporation must be amended by the shareholders as contradistinct from the board of directors.

The second procedural issue concerns a possible violation of Delaware General Corporation Law 8 § 203, a provision that requires a tender offeror to give notice to a target company not less than twenty days nor more than sixty days in advance of a tender offer. Moreover, certain required disclosures must be made to the target company in the notice. InterNorth argues, based on Crouse-Hinds' admission, that the notification to Belden was on September 22, 1980, only eleven days prior to the commencement of the exchange offer. As a consequence, InterNorth maintains that Crouse-Hinds' exchange offer was not legally commenced under, *inter alia* applicable Delaware law.

In response, Crouse-Hinds contends that InterNorth has failed to properly apply the business judgment rule, and has failed to marshal a showing that would impeach the

good faith acts, reasonableness and independent business judgment exercised in this matter by Crouse-Hinds' board of directors. Crouse-Hinds argues that InterNorth is wrongfully attempting to challenge the unfairness of the exchange offer and merger agreement under the guise of the business judgment rule. Crouse-Hinds claims that the actions of its board must be presumed to be in good faith and in the best interests of the corporation. In addition, Crouse-Hinds cites *Treadway Companies, Inc. v. Care Corp., supra*, as identical to the facts before this Court. In *Treadway*, as in the present case, management was moving toward a business combination with another corporation, and was found not to have acted in its own self-interest in executing defensive maneuvers to repel a takeover attempt. Moreover, here, as in *Treadway*, management offered proof that independent experts were consulted before the combination was approved.

Crouse-Hinds argues, in addition, that the business judgment rule encompasses a "primary purpose" test which would insulate the "selfish" acts of management, if the actions were primarily motivated by a legitimate business purpose. Along these lines, Crouse-Hinds asserts that it approved a merger with the Belden Corporation before it was even known that InterNorth had any interest in Crouse-Hinds. Crouse-Hinds alleges that, just as in *Treadway*, where the sale of stock by Treadway to Fair Lanes in order to facilitate merger discussions in which the parties were seriously engaged was deemed an appropriate exercise of business judgment, in the instant case the use of the exchange offer to safeguard the proposed merger is a matter well within the protection afforded by the business judgment rule. In fact, Crouse-Hinds believes that the exchange offer, far from being a selfish response, is instead a proper and legitimate means of making the previously formed, lawful objective of the Crouse-Hinds-Belden merger more certain of accomplishment. According to Crouse-Hinds, its directors have a fiduciary obligation to thwart the InterNorth tender offer insofar as it constitutes a threat to the Belden merger. The Court will now examine the applicable law.

In assessing the validity of defensive tactics in the context of a battle for corporate control, a court must assess the challenged conduct against the standard of conduct outlined in the business judgment rule.[17] This rule has recently been formulated by the New York Court of Appeals in *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y. S.2d 920, 926–27, 393 N.E.2d 994 (1979) as follows:

> [The business judgment rule] bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes. "Questions of policy of management, expediency of contracts or action, adequacy of consideration, lawful appropriation of corporation funds to advance corporate interests, are left solely to their honest and unselfish decision, for their powers therein are without limitation and free from restraint, and the exercise of them for the common and general interests of the corporation may not be questioned, although the results show that what they did was unwise or inexpedient." (*Pollitz v. Wabash R. R. Co.*, 207 N.Y. 113, 124 [100 N.E. 721, 724].)
>
> \* \* \* \* \* \*
>
> It appears to us that the business judgment doctrine, at least in part, is grounded in the prudent recognition that courts are ill equipped and infrequently called on to evaluate what are and must be essentially business judgments. The authority and responsibilities vested in corporate directors both by statute and decisional law proceed on the assumption that inescapably there can be no available objective standard by which the correctness of every corporate decision may be measured, by the courts or otherwise. Even if that were not the case, by definition the responsibility for business judgments must rest with the corporate directors;

---

17. *See* Arsht, The Business Judgment Rule, 8 Hofstra Law Rev. 93 (1979).

their individual capabilities and experience peculiarly qualify them for the discharge of that responsibility. Thus, absent evidence of bad faith or fraud (of which there is none here) the courts must and properly should respect their determinations.

Accord, Barr v. Wackman, 36 N.Y.2d 371, 368 N.Y.S.2d 497, 507, 329 N.E.2d 180, 187 (1975); Case v. New York Central Railroad Co., 15 N.Y.2d 150, 256 N.Y.S.2d 607, 611–12, 204 N.E.2d 643, 646–47 (1965); Treadway Companies, Inc. v. Care Corp., supra; see also Guth v. Loft, 23 Del.Ch. 255, 5 A.2d 503, 510 (1939).

█ The obligation of the director under the business judgment rule grows out of the fiduciary duty owed by the director to the corporation. Panter v. Marshall Field & Co., 486 F.Supp. 1168, 1192 (N.D.Ill.1980); Berman v. Gerber Products Co., 454 F.Supp. 1310, 1319 (W.D.Mich.1978); Applied Digital Data Systems v. Milgo Electronic, 425 F.Supp. 1145, 1153 (S.D.N.Y.1977); Condec Corp. v. Lunkenheimer Co., 43 Del.Ch. 353, 230 A.2d 769, 775–76 (1967); accord Young v. Valhi, Inc., 382 A.3d 1376 (Del.Ch.1978). At the same time, this fiduciary duty is not without limitation. It should be recognized that the very nature of a corporation puts the corporate fiduciary on a different footing than the ordinary fiduciary, Johnson v. Trueblood, 629 F.2d 287 (3rd Cir. 1980), because there is an element of self-interest in every managerial act. "The very fact that the director wants to enhance corporate profits is in part attributable to his desire to keep shareholders satisfied so that they will not dust him." Id.

█ In applying the business judgment rule, courts are to presume that the directors acted properly and in good faith, Treadway Companies, Inc. v. Care Corp., supra, at 382, and will be held accountable for their actions only when they are shown to have engaged in self-dealing or fraud, or to have acted in bad faith. Id. See Chicago Stadium Corp. v. Scallen, 530 F.2d 204, 207 (8th Cir. 1976). Once a plaintiff demonstrates that a director had an interest in the transaction at issue, the burden shifts to the

director to prove that the transaction was fair and reasonable to the corporation. Only when the director carries this burden will the transaction be upheld. However, the initial burden of proving the director's interest or bad faith always rests with the plaintiff. Treadway Companies, Inc. v. Care Corp., supra.

█ The burden of proof shifts if the directors who approved the challenged action had a concrete interest in the transaction which amounted to a real and obvious interest in retaining or strengthening their control over the corporation. Id. See Klaus v. Hi-Shear Corp., 528 F.2d 225 (9th Cir. 1975); Chicago Stadium Corp. v. Scallen, 530 F.2d 204 (8th Cir. 1976); Humana, Inc. v. American Medicorp, Inc. (1977–78 Transfer Binder) Fed.Sec.L.Rep. (CCH) ¶ 92,286, 92,833 (S.D.N.Y.1978); Royal Indus., Inc. v. Monogram Indus. (1976–77 Transfer Binder) Fed.Sec.L.Rep. (CCH) ¶ 95,863 at p. 91,136 (C.D.Cal.1978); Applied Digital Data Systems v. Milgo Electronic, 425 F.Supp. 1145, 1158 (S.D.N.Y.1977); Petty v. Penntech Papers, Inc., 347 A.2d 140, 143 (D.Del.1975); Condec Corp. v. Lunkenheimer Co., 230 A.2d 775–76 (1967). Once the burden has shifted, the directors must show that the transaction was fair in the sense that it was entered into for a proper corporate purpose, and not merely for the directors' selfish purposes. Treadway Companies v. Care Corp., supra, at 382; Cheff v. Mathes, 41 Del.Ch. 494, 199 A.2d 548, 555 (1964). When assessing the reasonableness of a director's response, a court need not insist that a company "have a perpetual 'for sale' sign on its front lawn." Lipton, Takeover Bids in the Target's Boardroom, 35 Bus. Lawyer 101, 112 (1979). Thus, proof of the use of an investment banker and legal counsel to assess independently the merits of a particular takeover attempt is useful. See New York Business Corporation Law § 717 (McKinney Supp.); Royal Indus. v. Monogram Indus., supra; Anaconda v. Crane Co., 411 F.Supp. 1210, 1215 (S.D.N.Y.). However, when considered among the totality of the circumstances, evidence of hastily conceived and negotiated defensive

maneuvers which tend to demonstrate that a board of directors was possessed of an opposition "at all costs" mentality, *Treadway Companies, Inc. v. Care Corp., supra,* at 383, would tend to indicate that the business judgment rendered was not within the fair and reasonableness standard of the business judgment rule. *Klaus v. Hi-Shear Corporation,* 528 F.2d 225, 233 (9th Cir. 1975); *Applied Digital Data Systems v. Milgo Electronic,* 425 F.Supp. 1145, 1159 (S.D. N.Y.1977). As a corollary to this rule, however, if after reasonable deliberations, a target management decides that a tender offer is not in the best interests of its company, it may resist the offer by any legal means available. *Treadway Companies, Inc. v. Care Corp., supra,* at 381; *Heit v. Baird,* 567 F.2d 1157 (1st Cir. 1980); *McPhail v. L.S. Starrett Co.,* 257 F.2d 388, 395 (1st Cir. 1958); *Panter v. Marshall Field & Co.,* 486 F.Supp. 1168, 1195 (N.D.Ill.1980); *Northwest Industries, Inc. v. B.F. Goodrich Co.,* 301 F.Supp. 706, 712 (N.D.Ill.1969).

In order to get to the heart of this matter, it may be useful to focus immediately on the Court's view of the applicability of the *Treadway* case to the instant dispute, in that this case is relied upon by both parties as support for their positions. The relevant facts of *Treadway* may be summarized as follows: The Care Corporation, finding itself in possession of a large amount of extra cash, had consulted an investment banker about conducting a study of a number of companies, including Treadway, that were involved in the bowling industry, with a view towards investing the excess cash in such companies. Care soon began acquiring large amounts of Treadway stock, keeping its options open on a possible acquisition of Treadway as it went along. At the same time, as its holdings of Treadway stock continued to grow, Care slowly jockied for increased representation on the Treadway board of directors. In the meantime, Treadway's board of directors hired an investment banker to examine several merger possibilities, including a possible Care-Treadway combination. Over a year later, after Treadway had been on notice of Care's large purchases of stock, its invest-

ment banker reported that a Care-Treadway combination would not be in the best interests of Treadway. As Care's holdings of Treadway grew, the Treadway board of directors became increasingly uneasy about Care's representation that it was not interested in merging with Treadway. Meanwhile, Treadway's investment banker hunted up other possible merger candidates for Treadway. By this time, Care had purchased enough Treadway stock to block any proposed merger. Treadway soon filed a lawsuit against Care under the 1934 Act, but its request for preliminary injunctive relief was denied. Soon thereafter, Treadway began to negotiate with Fair Lanes in the hopes that Fair Lanes would acquire a large block of Treadway authorized but unissued stock, to offset Care's interest, thereby precluding Care from blocking a merger, while enabling Fair Lanes to influence the election of Treadway directors. This activity was viewed as an essential first step by Fair Lanes toward an eventual merger with Treadway.

A board of directors election was held and the incumbent management was re-elected. All along, Treadway's negotiations with Fair Lanes were concealed from the Care directors sitting on the board of Treadway. By this time, the Treadway-Fair Lanes merger negotiations were proceeding ahead. The number of shares to be issued in the merger was agreed upon, and this figure was below the amount that could be issued and listed without obtaining approval of the shareholders under American Stock Exchange guidelines. The terms of the merger agreement included a "put" or resell clause that would enable Fair Lanes to obtain the right, for a one-month period commencing five months after the sale, to resell the shares to Treadway. This provision was designed to protect Fair Lanes in the event that the merger did not go through, such that it would not be burdened with an unsalable block of Treadway stock. Treadway also won a concession from Fair Lanes that, if the merger did not go through, Fair Lanes would not sell its block of Treadway stock to Care. Never-

theless, the deal did not go forward in this form because AMEX refused to list, without shareholder approval, a stock with a "put" provision. Yet, before this deal was abandoned, Care sued for a preliminary injunction to block the merger from going forward. Due to the premature nature of the motion, insofar as Treadway's board had not approved the merger, the motion was denied. The Care counterclaim went forward, as did a restructured merger agreement which did not envision shareholder approval. Subsequently, a Treadway board of directors' meeting was held and the board adopted a resolution to the effect that a takeover by Care would not be in the best interests of Treadway. Not surprisingly, there were two dissents. Treadway's investment banker and outside counsel advised the board that they could legally resist Care's merger attempt. The board adopted a further resolution authorizing management to proceed with the merger on the condition that the investment banker supply a "fair and reasonable" opinion letter to Treadway's shareholders.

The next round went to Care in the form of an injunction restraining the second version of the merger. A third deal was then structured, which would permit a straight sale of stock to Fair Lanes, that was designed to dilute Care's percentage ownership. Fair Lanes hoped that its acquisition of a block of Treadway stock would defeat Care's now stated intent to take over Treadway. A number of restrictions were built into the new merger agreement, including Fair Lanes' right to rescind the deal if for some reason it could not vote its shares, and Treadway's right of first refusal with respect to any sale of the shares by Fair Lanes. At a subsequent board meeting, the terms of the merger were discussed, including its negative impact on shareholder equity and earnings. The investment banker assessed and recommended the terms of the new deal as being fair. The board authorized the merger and voted, subject to its consummation, to increase the number of Fair Lane directors and to drop one Care director. At the next board meeting, one month later, a final

opinion letter was provided by the investment banker recommending the deal, and the directors voted in favor of the merger, after a week of deliberating on its advantages and disadvantages.

A proxy contest ensued and Care, with its holdings now diluted from 34% to 28%, renewed its motion for a preliminary injunction, this time to enjoin Fair Lanes from voting its newly acquired 230,000 shares of Treadway stock. After considering the arguments of the parties, the district court enjoined the voting of the Fair Lanes shares. Care had based its determination motion on the grounds that Treadway's directors had acted for improper purposes in entering into the stock sale to Fair Lanes and had thereby wasted corporate assets. The court started its deliberations with two principles in mind: First, that management has a right to resist a takeover attempt which it in good faith has determined to be detrimental to the interests of the company; and second, that management cannot use its powers simply as a means to protect itself from what it perceives to be a hostile takeover attempt.

The court concluded that the primary purpose of Treadway's entry into the sale was to thwart a Care takeover, and that both the sale and the consummation were the culmination of a plan of action intended to prevent Care from taking control of the corporation. The court also cited the following: the haste with which the Treadway-Fair Lanes negotiations had been conducted; Treadway's consistent structuring of its proposed transactions so as to avoid shareholder scrutiny; the absence of any good faith effort by incumbent management of Treadway to determine whether the takeover by Care would or would not be in the best interests of the corporation and its shareholders; the Treadway chairman's decision to oppose the takeover at all costs; and the Treadway-Fair Lanes merger's dilution of Care's holding. The court then arrived at the following conclusion:

As the primary purpose of the sale of stock to Fair Lanes was to influence the proxy contest, perpetuate incumbent

management's control over. Treadway, thwart Care's takeover bid, and dilute Care's statutory blocking position so as to influence the subsequent shareholders' vote on a proposed business combination, the Court finds that the issuance and sale of stock was improperly motivated, entered into for no legitimate business purpose, and constitutes a violation by the director defendants of their fiduciary duty.

*Treadway Companies, Inc. v. Care Corp.*, at 373.

The Court of Appeals reversed the district court and found that the Treadway board was "simply not acting to maintain its own control over the corporation. Rather in approving the stock sale, they were moving Treadway toward a business combination with Fair Lanes." *Id.* at 383. The Court of Appeals also cited the facts that Fair Lanes had made the stock sale a precondition to further merger talks, and that those merger discussions were not a sham or a pretext. Perhaps the key factor in the Court's opinion was that all but one of the Treadway board would lose their positions as a result of the Fair Lanes merger. Fair Lanes had requested that it be allowed to make up a majority of the Treadway directors, in that after the merger it would own more than 80% of Treadway stock. The Court stated:

[T]hus the consummation of the proposed business combination could not be expected to perpetuate control by these directors.

On the basis of the foregoing, we can only conclude that Care has not demonstrated an interest on the part of Treadway's directors [except for one director] such as would shift onto the directors the burden of proving fairness. The disinterested majority is therefore protected by the business judgment rule [citation omitted]. *Id.* at 383.

Lastly, the Court cited the fact that, while the record is sparse as to the steps taken by the Treadway board in regard to any information upon which the board based its judgment, the board did engage an invest-

ment banker and appeared to make a good faith examination of the financial data he provided.

Yet, the "we" (Judges Kearse and Newman) in the *Treadway* opinion is a bit misleading because Judge Feinberg dissented. Judge Feinberg defined the issue of the case as not whether the directors exercised their independent business judgment, but whether the district court,

[in the] face of *some* evidence of independent judgment and reasonable diligence, could find the contrary evidence to be more weighty, and could reasonably conclude that the outside directors did not exercise sufficiently independent judgment and reasonable diligence. On the record before us, I am not prepared to hold as a matter of law that the issue can only be decided one way.

*Id.* at 385 (Feinberg, J., dissenting). Judge Feinberg suggested that the case should have been remanded for a more thorough reconsideration.

The first distinction between the *Treadway* case and the present case is that the "critical fact" absent in *Treadway*—namely, the lack of evidence that the Treadway board acted to preserve its own control—is certainly present here. The Crouse-Hinds board of directors, unlike the Treadway board in the Fair Lanes merger, will survive a Belden merger and retain its control of Crouse-Hinds. Thus, under the *Treadway* decision, it cannot seriously be disputed that InterNorth has met its threshold burden of proof with respect to the interests of the board of directors. According to *Treadway*, the burden of proof now shifts to Crouse-Hinds to demonstrate that "the transaction was fair and equitable to the corporation." *Id.* at 382.

Before moving on to assess whether Crouse-Hinds has met its burden of proof, some other distinctions between *Treadway* and this case should be noted. First, the time period involved in *Treadway* from the time that it had been aware of a possible takeover attempt by Care to the report of its investment banker was over a year. As a result, whether or not the Treadway

board actually made a good faith effort to consider the possibility of merging with Care—and as Judge Feinberg points out there was a reasonable doubt that they did—certainly the opportunity for more careful study was present in that case than here, where four days expired between the time that InterNorth announced its tender offer and Crouse-Hinds' management rejected it as inadequate. More significantly, however, is the fact that in *Treadway*, the maneuvering of the board did not take place in full view of a democratic mechanism in the form of a shareholder's vote, which was intended to address the very topic that management had a deep personal stake in. That is, the merger between Crouse-Hinds and Belden, and the potential risk involved to management in view of InterNorth's tender offer if that merger were not to go through. It should also be noted that in *Treadway* there was no evidence to suggest that the Chairman of the Board and Chief Executive Officer (CEO) had a predisposition as to whether his company should merge with another. Through the testimony of an InterNorth witness, there is evidence here to suggest that Mr. Witting, Crouse-Hinds' CEO and Chairman, had an attitude which might have influenced the Crouse-Hinds board of directors and thus headed off a fair consideration of InterNorth's Offer.

█ Nonetheless, Crouse-Hinds seems to argue that it has in fact met its burden of proof in this case because the proposed merger was viewed by the board of directors as a reasonable business decision before InterNorth's announced takeover, and therefore it would be no less reasonable after the exchange offer. Moreover, Crouse-Hinds contends that any actions it takes in furtherance of that reasonable decision would be presumptively reasonable. In proffering these arguments, however, Crouse-Hinds in effect asks the Court to completely ignore commercial realities and the basic import of the business judgment rule. Under basic principles of negligence law, although a decision made at one point in time may be reasonable, if circumstances bearing on that decision subsequently

change, a reasonable person must reconsider that original decision in light of later events. In the context of the business judgment rule, the case of *Casey v. Woodruff*, 49 N.Y.S.2d 625 (Sup.Ct.1945), is enlightening:

> The question is frequently asked, how does the operation of the so-called "business judgment rule" tie in with the concept of negligence? There is no conflict between the two. When courts say that they will not interfere in matters of business judgment, it is presupposed that judgment—reasonable diligence—has in fact been exercised. A director cannot close his eyes to what is going on about him in the conduct of the business of the corporation and have it said that he is exercising business judgment. Courts have properly decided to give directors a wide latitude in the management of the affairs of a corporation provided always that judgment, and that means an honest, unbiased judgment, is reasonably exercised by them.

(footnote omitted), *Id.* at 643. Thus, Crouse-Hinds' argument that its directors did, or could ignore the fact of InterNorth's tender offer stretches the bounds of credulity. *See* Lynch and Steinberg, *The Legitimacy of Defensive Tactics in Tender Offers*, 64 Cornell Law Review 901, 933–34 (1979). As a dependent proposition, Crouse-Hinds' second argument falls with the first.

█ In this Court's view, the business judgment rule required Crouse-Hinds to give fair and reasonable consideration to the merits of InterNorth's tender offer, once the fact of the tender offer became known to it. Because InterNorth has sustained its burden of proof on the question of director interest, if Crouse-Hinds' directors cannot come forward with proof that their actions subsequent to the announcement of the tender offer were fairly decided, then InterNorth is entitled to a preliminary injunction restraining that illegal conduct. *See Klaus v. Hi-Shear Corp.*, 528 F.2d 225, 233 (9th Cir. 1975) (defensive tactic contemplated for over a year held

invalid in view of tender offer). Although the independent investment advice sought and proffered by Crouse-Hinds is certainly some proof of its effort to reach an objective determination about the merits of InterNorth's tender offer, in view of the strength of the evidence to the contrary, and of applicable case law, the Court does not believe that Crouse-Hinds has sustained its burden of proof under the business judgment rule.

A case very similar to the present matter is *Applied Digital Data Systems, Inc. v. Milgo Electronic Corp.*, 425 F.Supp. 1145 (S.D.N.Y.1977). In the facts of that case after Applied Digital announced that it desired to make an exchange offer for Milgo's stock, the target turned around and negotiated the sale of 312,000 unissued shares to a friendly third party. These shares amounted to 15.5 percent of the total shares of common stock and, when added with management's 6.5 percent interest would have ensured that over 20 percent of Milgo stock was owned by parties hostile to the tender offer. If the negotiated sale were consummated then the remaining Milgo shareholders could not receive a tax free advantage because less than eighty percent of Milgo's shares would have been exchanged.

Moreover, Milgo's management structured the size of the sale so that shareholder approval would not be required. When management was informed that their original offer would require shareholder approval, it reduced the size of the offer. Thus, if not enjoined management would have succeeded not only in defending against the tender offer, but would have accomplished this feat in a manner that would not have required shareholder approval. Based on this evidence, Judge Weinfeld found that the plaintiff had shown that the sale was without a legitimate business purpose and that it was designed only to prevent the Milgo shareholders from exercising their rights. To remedy the harm being caused, he enjoined Milgo from consummating the sale of stock.

Although *Applied Digital* was decided under the Williams Act, the court applied the business purpose rule to reach its result, and the reasoning is no less applicable here. 425 F.Supp. at 1158. This Court concludes that in the present case there is no legitimate business purpose served by the exchange of stock between Crouse-Hinds and Belden. Just as the court found in *Applied Digital*, that the challenged Milgo sale foreclosed fair consideration of Applied Digital's offer, the Crouse-Hinds-Belden exchange would in effect preclude the fair consideration by Crouse-Hinds shareholders of the Belden merger. In addition, as the joint prospectus reveals, Crouse-Hinds' management was certainly aware that indirectly this result would serve to defeat InterNorth's tender offer.

While the original merger agreement appeared to reflect a fair and reasoned consideration by the parties, the exchange agreement had all the hallmarks of a rush job. Firstly, Crouse-Hinds' management took precious little time to consider the merits of the InterNorth tender offer. As soon as it rejected the merits of InterNorth's offer it set about the task of attempting to discourage its shareholders from a fair opportunity to consider the tender offer. The exchange itself was designed so as not to require shareholder approval under the regulations of the New York State Stock Exchange, and it conceded a great deal to Belden to quickly secure approval. Furthermore, the merits of the exchange were so dubious that Belden's management could not even get an opinion letter from its investment banker that would endorse the exchange. In sum, InterNorth has shown serious questions going to the merits as to make them a fair ground for litigation that Crouse-Hinds management had conceived the exchange in order to accomplish two goals at once. The first was to force Crouse-Hinds shareholders into voting for the merger and the second was to discourage InterNorth's tender offer. Each was intended solely as a means for Crouse-Hinds' management to retain control of the corporation, and without regard for a fair consideration of the interests of the shareholders or of the corporation, in violation of the business judgment rule.

After considering the *Applied Digital* case, it becomes apparent that if the plaintiff had met the initial burden of proof on the issue of director interest, that case might very well have gone the other way. Almost all the same elements present in *Applied Digital* and the instant case were present in *Treadway* as well: hastily concluded negotiations, an all costs attitude towards culminating the defensive maneuver, an intentionally structured deal to avoid stockholder approval, all for the primary or sole purpose to retain control of the company. While the last element was not present in *Treadway*, it is clear that the instant case is distinguishable.

InterNorth's remaining arguments are either too speculative, or are without any proof to meet its initial burden on a preliminary injunction motion. The corporate wastes argument is internally inconsistent with other arguments made in this very case. InterNorth has claimed that the exchange device would virtually guarantee that the merger between Belden and Crouse-Hinds would succeed. If this were the case, then it defies logic to claim that the exchange agreement was risky. The certificate of incorporation is easily amended and thus this argument is without merit. As for the violation of the Delaware tender offer notice statute, InterNorth has offered no proof on the nature of the "discussions" and whether these "discussions" included a notification to Belden of the type of information required in the statute. The final issue to be examined is irreparable harm.

### B. *Irreparable Harm.*

While this Court does not believe that the Crouse-Hinds-Belden exchange offer would amount to a waste of Crouse-Hinds corporate assets it does believe that the offer, if allowed to proceed to fruition, would have resulted in a dilution of shareholders' equity and a disenfranchisement of the present Crouse-Hinds shareholders. According to both parties, the fruition of the exchange offer would also have resulted in rendering the present InterNorth tender offer moot. Such a deprivation of opportunity to the shareholders of both Crouse-Hinds and InterNorth constitutes irreparable injury to both. *Applied Digital Data Systems v. Milgo Electronic*, 425 F.Supp. 1145 (S.D.N.Y. 1977). Since the granting of an injunction regarding the exchange offer places all interested parties in the same position that they occupied prior to September 23, 1980, equity will be served. In addition, the near future presentation at stockholders' meetings of the Crouse-Hinds-Belden merger, with a full presentation of all material facts most probably will clear up the central issues herein.

Based upon the foregoing, the Court finds that InterNorth has shown sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.